[No. B090879. Second Dist., Div. Three. Mar. 15, 1995.]

LEA PURWIN D'AGOSTINO, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
ELIAS MARTINEZ, as City Clerk, etc., Real Party in Interest.

COUNSEL

Manatt, Phelps & Phillips, Ronald B. Turovsky and Coby A. King for Petitioner.

No appearance for Respondent.

James K. Hahn, City Attorney, Anthony Saul Alperin, Assistant City Attorney, Patricia V. Tubert and Kenneth Cirlin, Deputy City Attorneys, for Real Party in Interest.

OPINION

ALDRICH, J.—

INTRODUCTION

Petitioner Lea Purwin D'Agostino (petitioner) seeks a writ of mandate which would command real party in interest, the Los Angeles City Clerk, Elias Martinez (City Clerk), to place D'Agostino's name on the ballot for the special election of a member of the city council for the fifth council district, which is set for April 11, 1995, on the ground that she has substantially complied with the provisions of the city charter and the Elections Code, or, in the alternative, to allow her to submit additional signatures to qualify. Petitioner's name was not put on the ballot because, according to the City Clerk, her nominating petition did not contain the required 500 valid signatures of registered voters from the district.

Specifically, the requested writ would direct the respondent superior court to vacate its order denying her petition for a writ of mandate directing the

City Clerk to place her name on the ballot, and to enter an order granting the petition.

## ISSUE

Is petitioner in substantial compliance with Los Angeles City Charter and the Los Angeles Elections Code requirement that a nominating petition for Los Angeles City Council contain the valid signatures of 500 registered voters from the district to be represented?

Finding petitioner failed to comply with the requirements for nominating petitions and is not in substantial compliance with the Los Angeles City Charter and the Los Angeles Elections Code, we deny the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

A special election for the member of the city council for district five is scheduled for April 11, 1995. On January 25, 1995, petitioner filed a declaration of intent to become a candidate for that office. The City Clerk issued nominating petitions to petitioner and other declared candidates.

According to petitioner, she has been campaigning full time since her announcement and has received substantial financial support and a wide variety of endorsements. She hired a professional campaign staff and utilized the services of volunteers.

The guidelines for circulating petitions, issued by the City Clerk, advised that petition circulators must be registered voters, and set forth the pros and cons regarding differing strategies for circulating and filing petitions. It pointed out that by filing early the candidate would know sooner whether his or her petitions qualified. The guidelines stated, "City Clerk checks petitions in the order they are filed." Also, the guidelines stated that the candidate may have time to circulate and file a supplemental petition if the original was insufficient, and that the "[s]upplemental petition must be filed within 5 days after [your original] has been certified insufficient."

Petitioner's campaign plan was to submit the signatures in advance of the deadline in order to determine how many more were necessary, and then to supplement those signatures if required.

Jimmy Haydu was the primary individual working day-to-day on obtaining signatures on the petition. According to Mr. Haydu, he understood the

campaign intended to submit the nominating petition in advance of the February 14 deadline, "as soon as 500 or more signatures had been obtained." He telephoned the City Clerk's office on February 9, 1995, to confirm that he could bring petitioner's nominating petition down to the City Clerk's office "in order to see whether enough valid signatures had been obtained, and if not, how many additional were needed." He declares he was told signatures could not be submitted at that time, that they could not be reviewed until February 14, and therefore there was no use in submitting them at that time.

By February 14, the campaign had collected 721 signatures. About 2:30 or 3 p.m., Mr. Haydu submitted them to the City Clerk, who counted them and said he had submitted 681. Mr. Haydu asked that they be recounted, but the City Clerk's office refused. About 4 p.m., he discovered that two petitions had been left on a table at the campaign headquarters. About 4:30 p.m. he attempted to submit them, but Ms. Heffron (see fn. 1, *post*, at p. 112) refused to accept the petitions or count the signatures.

Ms. Michelle Maravich Carbone, a consultant to the campaign, declared she examined the petitions and the City Clerk's work sheets and certain voter registration data. According to her examination, two signatures designated "not found" matched voter registration records, one signator misdesignated his address by one number, and sixteen individuals were registered but listed different addresses on the petitions. Maravich also identified seven signatures of persons who did not sign as listed on the registration or who wrote down addresses out of the district and thirteen individuals who are registered out of the district but listed addresses in the district.

On February 24, 1995, petitioner filed an ex parte application for a petition for a writ of mandate in the superior court. She sought an order requiring the City Clerk to place her name on the ballot and an order requiring the City Clerk to count the signatures on the two petitions submitted an hour and a half after the first petitions, sixteen signatures of individuals registered in the district and eight others disallowed for miscellaneous reasons.

On February 27, 1995, the trial court granted the petition in part, ordering the City Clerk to consider the signatures on the two late petitions and credit petitioner for those found valid. The City Clerk found 22 of these signatures were valid bringing the total from 441 to 463. The trial court ordered three additional signatures be counted, and the City Clerk credited two, one having been previously counted. The total now was 465.

Upon petitioner's motion for clarification, on March 1, 1995, the trial court ordered the original order to stand.

The instant petition was filed on March 3, 1995, and on March 9 this division issued an alternative writ.

In opposition to the petition submitted later the same day the alternative writ was issued, the City Clerk contended that petitioner's nominating petition was not in substantial compliance with the specific requirement of 500 signatures. The written material provided to candidates by the elections division clearly stated that the petitions could be filed at any time between January 30 and February 14.[1] The petition submitted by Jimmy Haydu reveals that at the end of the day on February 9, when they were supposedly prepared to file more than 500 signatures, there were only 484 signatures.

Ms. Kristin Heffron, chief management analyst of the elections division and the elections supervisor, declared that she interviewed the employees of the elections division and did not locate anyone who recalled talking to Mr. Haydu. All who answer the telephone recall that they did not tell anyone that petitions could not be filed before February 14.

Additional opposition was filed on March 9, pursuant to the order of the alternative writ. Real party in interest, the City Clerk, moved to dismiss the alternative writ on the grounds that it was issued prematurely and improvidently, and was based on incorrect and misleading information provided by petitioner. He suggests that petitioner's request for clarification in the trial court was actually a motion for reconsideration made without notice or legal basis. Real party in interest contends petitioner unreasonably delayed in bringing this petition and is guilty of laches.

The mailing of sample ballots was scheduled to begin on Monday, March 13, 1995. In addition to the race for the fifth council district, this ballot contains eight ballot measures, a race for a member of the board of education and races for four members of the community college board of trustees. Ms. Heffron has postponed the mailing of the sample ballots until after the hearing set for March 15, 1995. The cost of reprinting the ballots will be in excess of $42,000, and will result in a delay of at least seven to ten days in the mailing.

Both the sample ballots and the official ballot pages which appear in the voting booths have now been printed. The vote recorder backing sheets have

---

[1]On December 20, 1994, the City Clerk's office announced the special election and included the following calendar, in pertinent part:
"JANUARY 30, 1995, MONDAY
"Last day to file or withdraw Declaration of Intention to Become a Candidate.
"First day to file Nominating Petitions
"FEBRUARY 14, 1995, TUESDAY
"Last day to file Nominating Petitions and/or Supplemental Petitions."

been prepared. Absentee voting begins, and election booths for absentee voters will be in operation, starting on Monday, March 13, 1995. The City Clerk will begin mailing absentee ballots on March 13.

Ms. Jacqueline C. Black, a temporary election clerk, declared she did not remember speaking to a person by the name of Jimmy Kadu (the petitioner refers to Jimmy Haydu as the person making the telephone call) during the filing period but she did recall speaking to a person who asked if he could bring in the petition he had so that it could be counted to determine whether it contained the required number of signatures. She told him he could file the petition if it contained all of the signatures the candidate wanted to file. She also told him that if he filed the petition at that time, he could not later file additional signatures if he did not have enough time, and that it would probably take from four to ten days to check the petition if he filed it that day. She did not tell him he could not file the petition before February 14, 1995.

The matter was heard on March 15, 1995.

## DISCUSSION

1. *The City Charter and Elections Code Require the Signatures of 500 Voters Registered in the District.*

The Los Angeles City Charter requires a nominating petition contain 500 signatures of registered voters from the district to be represented. (L.A. City Charter, § 319.)

The California Elections Code sets forth the requirements for voters. "No person shall be registered as a voter except by affidavit of registration." (Elec. Code, § 2102.) The affidavit must be executed and received on or before the 29th day before an election to be held in the registrant's precinct. (*Ibid.*)

A new affidavit of registration or a notice or letter of the change of address is required whenever a voter changes his or her residence address by moving "between the time of that person's last voter registration and the time for closing of registration for any given election . . . ." (Elec. Code, § 2116.) A registered voter may reregister if he or she lawfully changes his or her surname. (Elec. Code, § 2115.)

The city charter requires the petition to refer to the signers as "the undersigned, qualified, registered electors of the City of Los Angeles . . ."

and to state that if the person's name has been changed to make a statement to that effect. (L.A. City Charter, § 317.) It also requires the circulator of a petition declare that each signature is genuine and was affixed in his or her presence by a separate individual who declared himself at the time of signing to be a qualified, registered voter of the city and actually residing at the address given. (L.A. City Charter, §§ 317, 318.)

The city charter expressly prohibits the counting of any voter who is not a qualified, registered voter and resident of the district involved. (L.A. City Charter, § 6(b)(2).)

█ The importance of the correct address was emphasized by the California Supreme Court in *Assembly* v. *Deukmejian* (1982) 30 Cal.3d 638 [180 Cal.Rptr. 297, 639 P.2d 939]: "It is the duty of the county clerk or registrar of voters [in the case of referendum petitions] to compare a signer's current residence address on the petition with that individual's address as registered to vote in the records of registration maintained by the county clerk. If the addresses match, the requirement of [Elections Code] section 3516 that the signer be 'a qualified registered voter at the time of signing the petition' has been satisfied. However, without the petition signer's current residence address on the petition, it is *impossible* for the clerk to determine whether the signer was a 'qualified registered voter.' " (*Id.* at p. 647, original italics, fn. omitted.)

The city charter provides, "The City Clerk, upon filing with him of a nominating petition, shall determine whether or not the petition is signed by the requisite number of qualified registered electors. Within ten days after filing of such petition with the City Clerk, he shall attach his certificate thereto showing the result of his examination." (L.A. City Charter, § 320.)

"If, by the City Clerk's certificate, it shall appear that the petition has not been signed by the requisite number of qualified electors, it may be supplemented by filing a supplemental petition within five days from the date of said certificate. The said Clerk shall, within five days after the filing of such supplemental petition, make like examination of the supplemental petition, and shall certify as to the result of his examination, but no further supplement shall be allowed; and provided, further, that no supplement to such petition shall be allowed after the expiration of the time for filing nominating petitions, as set forth in Section 320 of this charter." (L.A. City Charter, § 321.)

The Los Angeles Elections Code section 323 provides the following: "Nominating petitions shall not be filed with the City Clerk by any candidate

earlier than eighty (80) days nor later than sixty-five (65) days prior to the primary nominating election, as provided in Section 320 of the Charter, and all signatures for filing shall be presented *at the same time*. No candidate shall file a petition containing less than 500 names. If, after filing the petition, it is found to contain less than 500 signatures, the petition shall be deemed insufficient, it shall not be necessary for the City Clerk to check the names thereon, and no supplement shall be filed."[2] (Italics added.)

Petitioner's contention that this section must apply to the last day for submittal only is meritless.

Petitioner also contends she was prejudiced by the misinformation that it would take from four to ten days to check her petitions. Although this may have been an overestimate, the law allows the clerk 10 days. As revealed in the bulletin issued by the City Clerk on February 16, 1995, which was cited by petitioner, review of some of the other candidate's petitions took only one to two days. However, it also reveals that three other petitions were filed on February 14, and had not qualified to that date, apparently because they had not been fully reviewed. It would not have been unreasonable to warn a person submitting a petition that it might take four days, especially near the end of the filing period when a number of other petitions were expected to be submitted.

### 2. This Is Not a Case of "Substantial Compliance."

■ Petitioner contends that 21 signatures should be considered valid, giving her a total of 486. She also contends it should not be necessary to review the signatures which were disallowed in order to find 500 valid signatures on her nominating petition, that under the circumstances, 465 or 486 or 500 is substantial compliance. We disagree. While a minimum of 500 valid signatures complies with the law, a lesser number does not.

The Los Angeles Elections Code, chapter I, section 2, states as a general provision, "A substantial compliance with the provisions of this code shall be sufficient for holding of any election hereunder, and for the approval or rejection of any ordinance, resolution, measure or proposition submitted to a vote of the electors of the City." (See also L.A. City Charter, § 337.) This appears to be a means to avoid nullifying the actions of the voters for some

---

[2]The dates for nominating petitions in the current special election do not correspond with the requirements of this provision. Neither petitioner nor the City Clerk raises any issue on this variation.

insubstantial variation in the procedures once the electorate has spoken, not a means to allow one to circumvent specific requirements.

In *Assembly* v. *Deukmejian, supra,* 30 Cal.3d 638, the Supreme Court held that referendum petitions which failed to comply with several requirements of the Elections Code were not in " 'substantial compliance' with statutory and constitutional requirements." (*Id.* at p. 652.) The petitions directed the signer to provide an address as registered to vote or to use the information as listed, even if incorrect, rather than complying with an Elections Code provision requiring a signer to affix his or her "residence address," instead. The court recognized that the requirement was important, going to the heart of ensuring that petitions have been signed by those entitled to do so. (*Id.* at p. 648.) The court rejected the parties' assertion that they had substantially complied with the applicable provision. "However, '[s]ubstantial compliance . . . means *actual* compliance in respect to the substance essential to every reasonable objective of the statute.' (*Stasher* v. *Harger-Haldeman* (1962) 58 Cal.2d 23, 29 [].) . . . That objective is totally thwarted when signers are instructed to provide residences that may or may not reflect their current addresses. Under such circumstances, real parties' claim of substantial compliance cannot be sustained." (*Id.* at p. 649.)

However, since the real parties relied upon established practice which had been accepted by the government entities charged with enforcing the procedures and which also had never been subjected to challenge from any source, the Court held the failure to comply would not be "deemed" to render the petitions invalid. (30 Cal.3d at p. 652.)

In addition, certain technical deficiencies did not invalidate the petitions: preprinted dates, typographical errors in the text of the statutes, and the use of small type size and interleaved pages. The court said: "This court has stressed that technical deficiencies in referendum and initiative petitions will not invalidate the petitions if they are in 'substantial compliance' with statutory and constitutional requirements. (*California Teachers Assn.* v. *Collins* (1934) 1 Cal.2d 202, 204 [].) A paramount concern in determining whether a petition is valid despite an alleged defect is whether the purpose of the technical requirement is frustrated by the defective form of the petition. 'The requirements of both the Constitution and the statute are intended to and do give information to the electors who are asked to sign the . . . petitions. If that be accomplished in any given case, little more can be asked than that a substantial compliance with the law and the Constitution be had, and that such compliance does no violence to a reasonable construction of the technical requirement of the law.' (*Ibid.*) None of the three errors

asserted here has interfered with the statutory purpose behind the technical regulations." (30 Cal.3d at pp. 652-653.)

The same cannot be said of the failure to provide the required number of signatures of qualified registered voters. In the instant case the lack of 500 valid signatures is not a "technical deficiency" but rather noncompliance with a substantive requirement for qualification for the ballot. As argued by real party in interest, the filing of 500 verified signatures demonstrates a "specific level of current, verifiable community support" which the City feels is appropriate for listing on a printed ballot. It is not the province of this court to legislate a lesser level of community support. Were we to do so we would become immersed in ambiguity, i.e., would 450 or 425 valid signatures be substantial compliance? Future applicants could never be certain how many valid signatures were actually required even though the law clearly prescribed 500.

■ The issue may be addressed on the basis of whether a particular provision is mandatory or directory. "If it goes to the substance or necessarily affects the merits or results of an election, the provision is mandatory. Provisions relating to the time and place of holding elections, the qualifications of voters and candidates and other matters of that character are mandatory. (*Atkinson* v. *Lorbeer* (1896) 111 Cal. 419, 422 []; and see 28 Cal.Jur.3d, Elections, § 124, pp. 608-609.)" (*Daniels* v. *Tergeson* (1989) 211 Cal.App.3d 1204, 1208 [259 Cal.Rptr. 879].) The court held the individual elected as county supervisor was not eligible for office in that he was not a registered voter in the district at least 30 days before the deadline for filing nomination papers for the office. It reversed the trial court which held the candidate who had been a registered voter for only 28 days before the deadline had substantially complied with the requirement.

In distinguishing the substantial compliance doctrine when applied to initiatives and referenda, the *Daniels* court stated: "The rationale for substantial compliance with statutory provisions relating to [the] election [of] officers and conduct of the polls has no application in the realm of candidate qualifications. Consequentially, the cases holding that substantial compliance with certain election laws is sufficient are inapplicable to [the 30-day registered voter requirement at issue.] Respondent properly was charged with knowledge of the qualification requirements of the office he sought. When he failed to meet the specified deadline, he was ineligible for the office to which he was elected. [Citations.]" (211 Cal.App.3d at p. 1210.)

A recent case addressed the duty of the city clerk in similar circumstances. In *Browne* v. *Russell* (1994) 27 Cal.App.4th 1116 [33 Cal.Rptr.2d 29],

the city clerk invalidated a number of signatures on a referendum petition to place a city ordinance on the ballot because the persons who circulated some portions of the petition were not residents and registered voters, as required. The court reversed the order of the trial court directing the clerk to count the signatures. In holding that the parties' referendum powers were not violated by the city clerk's refusal to count the signatures, the court stated: "In this case, the Clerk did not decide to investigate the validity of the 1,111 signatures that were presented by the unregistered circulators to determine if there were 623 qualified signatures among them. Neither [*Truman* v. *Royer* (1961) 189 Cal.App.2d 240 (11 Cal.Rptr. 159)] nor any other case cited by respondents requires that the Clerk should have done so. It was incumbent upon respondents to comply with section 339, the requirements of which they concede they knew. The Clerk was under no obligation to save their petition from the effects of their failure to so comply." (27 Cal.App.4th at p. 1127.)

The parties do not cite, and research has not disclosed, any authority for considering less than the required number of signatures to be "substantial compliance." For the reasons stated in this opinion we hold it is not.

### 3. *The Circumstances Do Not Excuse Compliance in This Case.*

█ Even if it is assumed that on February 9 petitioner's campaign staff received misinformation regarding the requirements for filing petitions, it is evident that petitioner did not have at least 500 signatures, valid or invalid, ready to submit on that date.

Petitioner has already received some relief in the filing requirements when the trial court ordered the City Clerk to count those signatures submitted after the initial filing. Nevertheless, even when the valid signatures on those petitions are considered, petitioner does not qualify for the ballot.

The elections and campaign literature distributed by the City Clerk accurately described the requirements and procedures for submitting nominating petitions. The dates and deadlines were clearly set forth. The city charter and the city elections code also set forth the requirements, including the requirement that the petition contain the signatures of 500 registered voters in the district. Petitioner cannot claim to have been misled to her detriment by established practice or official governmental directives. (See *Board of Supervisors* v. *Superior Court* (1983) 147 Cal.App.3d 206, 215, 216 [195 Cal.Rptr. 67] [estoppel doctrine did not allow petitioners extra 30 days to acquire required signatures].)

## DISPOSITION

Petition denied. Alternative writ discharged.

Croskey, Acting P. J., and Kitching, J., concurred.