[No. D049983. Fourth Dist., Div. One. Mar. 10, 2009.]

THOMAS E. TROYK, Plaintiff and Respondent, v.
FARMERS GROUP, INC., et al., Defendants and Appellants;
PREMATIC SERVICE CORPORATION et al., Movants and Appellants.

1306

**COUNSEL**

Gibson, Dunn & Crutcher, Theodore J. Boutrous, Jr., Gail E. Lees, Christopher Chorba, James L. Zelenay, Jr., Kahn A. Scolnick; Skadden, Arps, Slate, Meagher & Flom, Raoul D. Kennedy, Douglas B. Adler and Darrel J. Hieber for Defendants and Appellants.

Fulbright & Jaworski, Richard R. Mainland, Peter H. Mason and Eric A. Herzog for Movants and Appellants.

Coughlin Stoia Geller Rudman & Robbins, Timothy G. Blood, Pamela M. Parker, Kevin K. Green and Leslie E. Hurst for Plaintiff and Respondent.

**OPINION**

**McDONALD, J.**—Plaintiff Thomas E. Troyk filed a class action against defendants Farmers Group, Inc., doing business as Farmers Underwriters Association (FGI), and Farmers Insurance Exchange (FIE) (together Farmers) alleging causes of action for breach of contract and violation of Business and Professions Code section 17200 et seq. (unfair competition law; hereafter UCL). He alleged FIE required him to pay a service charge for the payment of the premium for his automobile insurance policy's one-month term and, because the service charge was not stated in his policy, FIE violated the requirement of Insurance Code section 381, subdivision (f),[1] that "premium" be stated in an insurance policy.

The trial court granted Troyk's request for class certification, granted Troyk's motion for summary judgment, and denied Farmers' motion for summary judgment. The court then entered judgment awarding Troyk and the other class members $115,556,827 for service charges paid by those members.

On appeal, Farmers contend (1) the trial court erred by interpreting the term "premium," as used in section 381, subdivision (f), to include the service charge imposed for payment in full of the stated premium for the policy's one-month term; (2) even if the service charge is premium, they complied, either actually (because of incorporation by reference to other documents) or substantially, with section 381, subdivision (f)'s disclosure requirement; (3) the court erred by concluding Troyk proved his breach of contract and UCL causes of action and by awarding the class members full

---

[1] All further statutory references are to the Insurance Code unless otherwise specified.

restitution for the service charges they paid; and (4) the judgment violates their constitutional right to due process of law.

Following oral argument in this appeal, we requested, and have received and considered, supplemental briefing by the parties on the issues whether (1) Troyk had standing under Business and Professions Code section 17204 to bring this action; and (2) the issue of standing was raised in the trial court by Farmers and, if not, whether that issue has been waived.

Because we interpret the term "premium," as used in section 381, subdivision (f), to include a service charge imposed for the payment in full of the stated premium for an insurance policy's one-month term, we conclude Farmers violated that statute's disclosure requirement. However, because in moving for summary judgment Troyk did not show there is no triable issue on the element of causation regarding his standing to prosecute the UCL cause of action, we conclude the trial court erred by granting his motion for summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

FIE is a reciprocal or interinsurance exchange organized under California law (§ 1280 et seq.) and is licensed to sell insurance in California and Nevada. FIE is owned by its subscribers, who are deemed its insureds. (§ 1303 ["[E]ach subscriber shall be deemed an insured."].) FGI is a Nevada corporation, but not an insurance company, and is the attorney-in-fact for FIE and performs certain administrative services for FIE. Both FIE, as an insurer, and FGI, as its attorney-in-fact, are "subject to and regulated by all of the provisions of [the Insurance Code]," except as otherwise exempted. (§ 1281.) Prematic Service Corporation, a California corporation (Prematic California), is a wholly owned subsidiary of FGI. Prematic Service Corporation, a Nevada corporation (Prematic Nevada), is a wholly owned subsidiary of Prematic California. The sole business of Prematic California and Prematic Nevada (together Prematic) is to handle monthly billing for customers of FIE and other insurance companies by agreements with those customers.

FIE offers automobile insurance with policy terms of either six months or one month. If an insured chooses a six-month term, the premium is payable in either one lump sum or two installments (under FIE's two-pay plan). If the insured chooses a one-month term, FIE in effect converts its six-month policy into a one-month policy by issuing an endorsement called the "Monthly Payment Agreement" (i.e., endorsement form No. E0022), which provides:

"In consideration of the premium deposit, we agree to the following:

"(1) *The policy period is amended to one Calendar month.* It will commence with the effective date shown in the Declarations.

"(2) *The policy shall continue in force for successive monthly periods if the premium is paid when due. The premium is due no later than on the expiration date of the then current monthly period.*

"(3) The monthly premium shall be subject to future adjustment. Such adjustment will apply the then current rate on the semi-annual or annual anniversary of the policy whichever is indicated in the Declarations as applicable.

"This endorsement is part of your policy. It supersedes and controls anything to the contrary. It is otherwise subject to all other terms of the policy." (Italics added.) However, to obtain a one-month, or monthly, term policy, FIE first *requires* that the insured enter into an agreement with Prematic (Prematic Agreement), pursuant to which Prematic agrees to send a monthly premium bill to the insured (requesting payment by check payable to Prematic) and, on receipt of the premium payment and its service charge (e.g., $5 per payment), forward the insured's payment to FIE (less Prematic's service charge).[2]

In 1991 Troyk purchased an automobile insurance policy from FIE, which policy has since been continuously renewed. He chose to pay the stated premium monthly, rather than every six months, and, accordingly, entered into the Prematic Agreement discussed above. FIE then issued to Troyk its standard form six-month policy, but with the Monthly Payment Agreement endorsement (form No. E0022) amending the six-month term to a *one-month term.* As renewed in 2005, the policy's declarations page lists the total premium to be paid over the course of six months, but leaves blank the space adjacent to the item "fees" and therefore does not include, either separately or as part of the total premium, any statement of Prematic's service charges. Furthermore, adjacent to the item "Total" is typed "Prematic" (rather than a dollar amount). The declarations page includes a reference to the Monthly Payment Agreement endorsement (form No. E0022) and lists the number assigned to Troyk's agreement with Prematic (i.e., "PREMATIC NO[.] A641249"). Since 1991, Troyk has received monthly bills from Prematic for FIE's stated premiums and Prematic's service charges, and has made payments to Prematic for the billed amounts (including its service charges).

---

[2] FIE does not allow an insured to pay the stated premium for a one-month policy term directly to FIE without a service charge. Rather, an insured can only obtain a one-month policy by first complying with FIE's requirement to enter into the Prematic Agreement and paying the monthly premium and the service charge to Prematic.

In October 2004 Troyk filed the instant class action. In December, he filed the operative first amended complaint alleging causes of action for breach of contract and violation of the UCL. In particular, Troyk alleged he "has suffered an injury in fact and has lost money as a result of the conduct alleged." He further alleged:

"14. Farmers offers its personal lines automobile insurance policyholders two options for the term of insurance coverage. Under the first option, Farmers offers insurance coverage for a term of six months. Under the second option, Farmers offers insurance coverage for a term of one month.

"15. Regardless of whether the term of coverage is for one month or six months, the premium Farmers asserts it charges is the same for otherwise identical coverage and risk. That is, the premium Farmers states in its insurance policy is the same per month regardless of the length of the term.

"16. In fact, regardless of whether an insured chooses a six month term or one month term, Farmers uses the same policy and the same Declarations page, which lists the same premium amount for a six month period. If the insured desires a monthly term, Farmers adds an endorsement to the policy, which modifies the policy from six months to one month, for a premium that is one-sixth the premium for a six month term. The endorsement states that '[t]he policy period is amended to one Calendar month.' . . .

"17. Although the Declarations page states the total amount of premium, Farmers nonetheless charges policyholders who purchase insurance by the month additional premium which it euphemistically refers to as a 'service charge.' The service charge is not included anywhere in the policy, but is nonetheless added in addition to the premium stated in the policy.

"18. [Troyk] has purchased automobile insurance from Farmers. . . . The Declarations page of the policy period beginning on May 25, 2004 states that the premium for the policy for six months is $345.40.

"19. [Troyk] did not buy six months of insurance coverage. Instead, [he] bought insurance for a one month term. Like all policyholders who purchase a Farmers policy in one month terms, [his] policy contains the endorsement which states that '[t]he policy period is amended to one Calendar month.'

"20. Instead of charging [Troyk] one-sixth of the six month premium quoted on the Declarations page, Farmers improperly charged [him] an additional monthly premium of $5.00.

"21. [Troyk's] payments with respect to his Farmers' policy [were] paid to Prematic Service Corporation, which is a corporate affiliate of Farmers. Prematic Service Corporation, in collecting payments from Farmers' policyholders, acts as the agent of Farmers." Troyk's complaint sought injunctive relief against Farmers and full restitution from Farmers of the service charges paid by members of the class and the general public.

The trial court granted Troyk's motion for class certification, certifying a class of those persons in California and Nevada who, between October 6, 2000, and August 26, 2005, purchased and paid for insurance policies from Farmers on a monthly basis and incurred service charges in addition to the premiums specified in their policies. It was apparently determined there are about 975,000 members in the certified class.

In August 2005 Prematic filed a motion to intervene in the action. The trial court denied the motion, finding the motion was untimely filed and FGI and Prematic had the same interest in the service charges. It also stated that it appeared Prematic's interests were being adequately represented by FGI.

In September, Troyk filed a motion for summary judgment or, in the alternative, summary adjudication of issues. Farmers also filed a motion for summary judgment.

On June 20, 2006, the trial court granted Troyk's motion for summary judgment and denied Farmers' motion. The court stated:

"When policyholders obtain car insurance through FIE, they have three payment options. They can (1) pay 100% up front; (2) pay 50% up front and 50% in 60 days; or (3) make payments monthly through a service offered by non-party Prematic Service Corporation. [Citations.] If the customer pays 100% up front, there is no 'service charge.' If the customer makes two payments of 50%, FIE charges a 'service charge.' [Citation.]

"However, if the policyholder chooses to make monthly payments, information is sent from FIE's agent to Prematic, [which] sets up a Prematic billing account. [Citations.] The policyholder is required to enter into an agreement with Prematic to make the monthly payments to Prematic, along with a 'service charge' for administering the plan. [Citations.] Prematic in turn forwards the payment to the insurer. [Citation.] The policy is amended from a six month to a one month policy. [Citations.] Prematic may terminate the agreement if the policyholder fails to make timely payments to Prematic. [Citation.]

"The insurance policy must provide a statement of the premium. (Ins. Code[,] § 381(f)[.]) It is a misdemeanor for any insurer to issue a policy in violation of § 381(f). (Ins. Code[,] § 383[.])

" 'Premium' in the law of insurance means the amount paid to the company for insurance. It is the sum which the insured is required to pay. [Citation.] The gross premium consists of two elements: the net premium and the loading. The net premium is the expected level of claims payments. The loading is added to the net premium to cover the expenses of the company and usually includes the administrative costs of the insurer and an element of profit. [Citation.] Thus, the 'service charge' paid by policyholders to Prematic is a premium under Ins. Code § 381(f) and should be disclosed as such on the declarations page. . . ." Accordingly, the trial court found Farmers breached the insurance contract with the class members and also engaged in an unlawful business practice under the UCL by imposing the service charge undisclosed in the policy. It rejected Farmers' argument that they were not liable for service charges collected by Prematic, finding both FGI and Prematic are agents of FIE. It further found that although "Prematic is ostensibly performing FGI's duties as FIE's attorney in fact, in reality it appears FGI is still performing those duties." The court also stated: "FIE and its agent and attorney in fact, FGI, must comply with [I]nsurance [C]ode provisions, such as § 381(f). (Ins. Code[,] § 1281[.]) The premiums are collected by FIE's agents, FGI and Prematic. FIE could not provide insurance without its agents. What the agent receives, in legal effect[,] the insurer receives. [Citation.] Thus, FIE, FGI and Prematic are operating as a single enterprise to transact the business of insurance. Therefore, both FIE and FGI are liable for the [I]nsurance [C]ode violations, contract breaches and unfair business practices." The court concluded: "[S]ummary judgment is granted in favor of plaintiffs and [Farmers'] motion for summary judgment is denied. [Farmers] are liable for the premium amounts paid in excess of the premium stated on the declarations page of the class members' insurance contracts." The court found Farmers must pay restitution in the full amount of the service charges unlawfully acquired by Farmers from the class members during the class period.

The parties subsequently stipulated that the aggregate amount of service charges collected by Farmers (through Prematic) from the class members during the class period was $115,556,827.

On August 21, 2006, the trial court entered judgment for Troyk, as the class representative of the certified class, against FGI and FIE in the amount of $115,556,827. It retained jurisdiction "to determine and oversee an award distribution plan." The court subsequently issued an order awarding Troyk prejudgment interest and then interlineated its judgment to provide for an award of $21,655,032 in prejudgment interest.

On September 14, Farmers and Prematic each filed motions to set aside or vacate the judgment. The trial court denied the motions.

Farmers and Prematic each timely filed notices of appeal.[3]

## DISCUSSION

### I

*Summary Judgment Standard of Review*

"[A]fter a motion for summary judgment has been granted [by a trial court], [an appellate court] review[s] the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. [Citation.]" (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089]; see *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767 [107 Cal.Rptr.2d 617, 23 P.3d 1143].) "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute. [Citation.]" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).)

*Aguilar* clarified the standards that apply to summary judgment motions under Code of Civil Procedure section 437c. (*Aguilar, supra,* 25 Cal.4th at pp. 843–857.) Generally, if all the papers submitted by the parties show there is no triable issue of material fact and the "moving party is entitled to a judgment as a matter of law" (Code Civ. Proc., § 437c, subd. (c)), the court must grant the motion for summary judgment. (*Aguilar,* at p. 843.) Code of Civil Procedure section 437c, subdivision (p)(1), states: "A plaintiff or cross-complainant has met his or her burden of showing that there is no defense to a cause of action if that party has proved each element of the cause of action entitling the party to judgment on that cause of action. Once the plaintiff or cross-complainant has met that burden, the burden shifts to the defendant or cross-defendant to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The defendant or cross-defendant may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto." *Aguilar* made the following observations:

---

[3] We separately address Prematic's appeal in the unpublished portion of this opinion, *post.*

"First, and generally, from commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. . . . There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. . . .

"Second, and generally, the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact. . . . A prima facie showing is one that is sufficient to support the position of the party in question. . . .

"Third, and generally, how the parties moving for, and opposing, summary judgment may each carry their burden of persuasion and/or production depends on *which* would bear *what* burden of proof at trial. . . . [I]f a plaintiff who would bear the burden of proof by a preponderance of evidence at trial moves for summary judgment, he must present evidence that would *require* a reasonable trier of fact to find any underlying material fact more likely than not—otherwise, he would not be entitled to judgment *as a matter of law*, but would have to present his evidence to a trier of fact." (*Aguilar, supra*, 25 Cal.4th. at pp. 850–851, fns. & citation omitted.) Summary judgment law in California "no longer requires a plaintiff moving for summary judgment to disprove any defense asserted by the defendant as well as prove each element of his own cause of action." (*Id.* at p. 853.) It is sufficient for a plaintiff to prove each element of the cause of action. (*Ibid.*) *Aguilar* stated: "To speak broadly, all of the foregoing discussion of summary judgment law in this state, like that of its federal counterpart, may be reduced to, and justified by, a single proposition: *If a party moving for summary judgment in any action . . . would prevail at trial without submission of any issue of material fact to a trier of fact for determination, then he should prevail on summary judgment.* In such a case, . . . the 'court should grant' the motion 'and avoid a . . . trial' rendered 'useless' by nonsuit or directed verdict or similar device. [Citations.]" (*Id.* at p. 855, italics added.)

On appellate review of an order granting or denying a motion for summary judgment, "we exercise 'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law.' [Citation.] 'The appellate court must examine only papers before the trial court when it

considered the motion, and not documents filed later. [Citation.] Moreover, we construe the moving party's affidavits strictly, construe the opponent's affidavits liberally, and resolve doubts about the propriety of granting the motion in favor of the party opposing it.' [Citations.]" (*Seo v. All-Makes Overhead Doors* (2002) 97 Cal.App.4th 1193, 1201–1202 [119 Cal.Rptr.2d 160].)

## II

### *The Meaning of the Term "Premium" As Used in Section 381, Subdivision (f)*

Farmers contend the trial court erred by granting Troyk's motion for summary judgment and denying their motion for summary judgment because the court erroneously concluded the term "premium," as used in section 381, subdivision (f), includes the service charge imposed for payment of the stated premium for the one-month term.

### A

Section 381, enacted in 1935, provides:

"*A policy shall specify*:

"(a) The parties between whom the contract is made.

"(b) The property or life insured.

"(c) The interest of the insured in property insured, if he is not the absolute owner thereof.

"(d) The risks insured against.

"(e) The period during which the insurance is to continue.

"(f) Either: [¶] (1) *A statement of the premium*, or [¶] (2) If the insurance is of a character where the exact premium is only determinable upon the termination of the contract, a statement of the basis and rates upon which the final premium is to be determined and paid." (Italics added.)[4] Neither section

---

[4] In a related provision, section 383.5 states: " 'Document,' as used in this section, means a policy or a certificate evidencing insurance under a master policy. The policy or certificate shall conform to Section 381 and shall segregate the premiums charged for each risk insured against. The certificate, in lieu of specifying the risks insured against, may designate them by

381 nor any other provision of the Insurance Code defines the term "premium." Furthermore, the parties have not cited, nor have we found, any case that interprets the term "premium," as used in section 381, subdivision (f), in the context of service charges imposed for payment in full of the stated premium for insurance coverage for a one-month term. Accordingly, we consider that question to be one of first impression.

■ "Our task in interpreting a statute 'is to ascertain and effectuate legislative intent. [Citations.]' [Citation.] In order to do so, '[w]e turn first to the words of the statute themselves, recognizing that "they generally provide the most reliable indicator of legislative intent." [Citations.] When the language of a statute is "clear and unambiguous" and thus not reasonably susceptible of more than one meaning, " ' " 'there is no need for construction, and courts should not indulge in it.' " ' " [Citations.]' [Citation.]" (*People v. Leal* (2004) 33 Cal.4th 999, 1007 [16 Cal.Rptr.3d 869, 94 P.3d 1071].) Alternatively stated, under the rules of statutory construction, "[i]t is settled that ' "[w]e are required to give effect to statutes 'according to the usual, ordinary import of the language employed in framing them.' [Citations.]" ' [Citation.] Stated otherwise, '[w]hen statutory language is thus clear and unambiguous there is no need for construction, and courts should not indulge in it.' [Citations.] [¶] We have declined to follow the plain meaning of a statute only when it would inevitably have frustrated the manifest purposes of the legislation as a whole or led to absurd results. [Citations.]" (*People v. Belleci* (1979) 24 Cal.3d 879, 884 [157 Cal.Rptr. 503, 598 P.2d 473], superseded by constitutional amendment on another ground as noted in *People v. Moore* (1988) 201 Cal.App.3d 877, 885 [247 Cal.Rptr. 353].) "It is our task to construe, not to amend, the statute. 'In the construction of a statute . . . the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or omit what has been inserted . . . .' [Citation.] We may not, under the guise of construction, rewrite the law or give the words an effect different from the plain and direct import of the terms used." (*California Fed. Savings & Loan Assn. v. City of Los Angeles* (1995) 11 Cal.4th 342, 349 [45 Cal.Rptr.2d 279, 902 P.2d 297].)

B

■ Based on our independent interpretation of the relevant statutory language, we conclude the clear and unambiguous meaning of the term "premium," as used in section 381, subdivision (f), includes a service charge

name or by description. 'Document' also includes the applicable policy form and a subsequently issued declarations page conforming to Section 381 or an endorsement. [¶] . . . [¶] The purpose of this section is to prevent fraud or mistake in connection with the transaction of insurance covering motor vehicles . . . ."

imposed for payment in full of the stated insurance premium for a one-month term policy. As we stated in *Interinsurance Exchange of the Automobile Club v. Superior Court* (2007) 148 Cal.App.4th 1218 [56 Cal.Rptr.3d 421] (*Auto Club*), "[i]t is commonly understood that a premium is the amount paid for certain insurance for a certain period of coverage." (*Id.* at p. 1230, fn. omitted.) Because section 381 "presumably is a consumer protection statute" (*id.* at p. 1226), the meaning of "premium," as used in section 381, subdivision (f), is interpreted from the perspective of the consumer (i.e., the insured). In the circumstances of this case, Troyk and the other class members were *required* to pay a service charge in addition to the stated premium to obtain and pay for a one-month term of insurance coverage.[5] They could not obtain or pay for that one-month term policy by paying only the premium stated on the declarations page or elsewhere in the policy. Therefore, from the *insureds'* perspective in this case, "premium," for purposes of section 381, subdivision (f), is the total amount the insureds were required to pay to obtain insurance coverage for a one-month term (i.e., the stated premium plus the service charge imposed for payment in full of that stated premium).[6]

Because FIE *required* the insureds to pay those service charges to obtain a one-month term policy, it is irrelevant that Prematic, instead of FIE, directly received that service charge. In any event, as we discuss below, because Prematic was acting as FIE's agent in billing and collecting from the insureds the stated premiums and required service charges and in forwarding the stated premiums (less the service charges) to FIE, FIE is charged with constructive receipt of those service charges for purposes of section 381, subdivision (f).[7]

Although it is not the determinative test for premium under section 381, subdivision (f), consideration of this issue from an *insurer's* perspective provides additional support for our conclusion that "premium" includes the stated premium plus any service charge required to obtain insurance coverage for a certain period (e.g., a one-month term policy). As Farmers represent in

---

[5] Contrary to Farmers' assertion, the fact that Troyk and the other class members *voluntarily* elected to pay their stated premiums each month, together with a service charge, does not disprove that FIE *required* them to enter into the Prematic Agreement and pay the service charges as a precondition to obtaining the one-month term policy provided for by the Monthly Payment Agreement endorsement (form No. E0022), as discussed below.

[6] *Buss v. Superior Court* (1997) 16 Cal.4th 35 [65 Cal.Rptr.2d 366, 939 P.2d 766], cited by Farmers, does not show otherwise. Rather, in that factually inapposite case, the California Supreme Court generally stated: "An insurance policy is a contract between an insurer and an insured [citations], the insurer making promises, and the insured paying premiums, the one in consideration for the other, against the risk of loss [citations]." (*Id.* at p. 45.) *Buss* did not address the elements of premium, as used in section 381, subdivision (f), or address the specific issue in this case. Accordingly, it does not persuade us to reach a contrary conclusion.

[7] The fact that the service charge was not paid, or did not "inure," to FIE does not show it is not part of the premium, as used in section 381, subdivision (f).

their brief, the service charges were compensation "for the administrative services associated with . . . billing, collections, and forwarding of premium funds to [FIE]." Philip Moore, Prematic's president, stated in his declaration: "FIE insureds who wish to pay for their coverage on a monthly basis agree to pay Prematic a service fee in return for Prematic's performing the additional tasks needed to facilitate payment of premiums on a monthly basis."

Moore explained during his deposition that Prematic received the service charge "[f]or the expense of sending—consolidating bills, for mailing bills to the customer, for receiving the premium payment, and . . . collecting the service fee and forwarding the premium payment to [FIE]." Therefore, in this case the service charges were imposed solely to cover the administrative expenses of creating and mailing monthly bills to insureds, receiving monthly payments, and forwarding the stated premiums to FIE (less the service charges Prematic retained). Those administrative expenses were necessarily incurred (albeit by Prematic) because FIE required its insureds to pay their stated premiums, plus service charges, to Prematic to obtain a one-month term policy. Had Prematic (or another agent) not performed those administrative services on FIE's behalf, FIE presumably would have directly performed those services and received the service charges. In that scenario, all of those administrative costs (i.e., billing and collection costs) presumably would be included among the insurer's costs of providing insurance coverage for a certain period of time (e.g., a one-month term).

■ From an insurer's perspective, the premium charged an insured for insurance coverage for a certain period presumably includes, and generally exceeds, all costs associated with providing that coverage. Therefore, an insurance premium includes not only the "net premium," or actuarial cost of the risk covered (i.e., expected amount of claims payments), but also the direct and indirect costs associated with providing that insurance coverage and any profit or additional assessment charged (e.g., "loading"). (Cf. *Metropolitan Life Ins. Co. v. State Bd. of Equalization* (1982) 32 Cal.3d 649, 660 [186 Cal.Rptr. 578, 652 P.2d 426] [discussing elements of "gross premiums" for insurance company taxation purposes].)[8] Because the direct administrative cost of creating and mailing bills for and collecting payments for the premium charged for insurance coverage provided for a certain policy period (e.g., a one-month term) is presumptively included among an insurer's costs of providing insurance coverage, that cost is presumptively part of the premium charged by an insurer for providing insurance coverage for a certain

---

[8] Although we cite *Metropolitan Life Ins. Co. v. State Bd. of Equalization, supra,* 32 Cal.3d 649 for purposes of analogy, we do not (unlike the trial court in this case) rely on that case as support for our conclusion that the term "premium," as used in section 381, subdivision (f), includes a service charge an insurer requires an insured to pay in addition to the stated premium for a certain period of coverage.

period. Accordingly, consideration of premium from an insurer's perspective supports our conclusion that an insurer's requirement that an insured pay a service charge for those administrative services, in addition to payment in full of the stated premium, is necessarily included within the term "premium," as used in section 381, subdivision (f).[9]

## C

The service charges FIE required Troyk and the other class members to pay were *not* imposed for the privilege of paying the premium for a six-month term policy in monthly installments or otherwise over time. Rather, as shown by the Monthly Payment Agreement endorsement (form No. E0022), the policy issued to the class members was for a one-month term, not a six-month term. Although FIE initially offered Troyk (and presumably the other class members) a six-month term policy that would not require payment of a service charge were the stated six-month premium paid in full, FIE also offered Troyk and the other class members the option to pay their premium on a monthly basis on the condition that they enter into the Prematic Agreement with, and pay a service charge to, Prematic for the payment of monthly premiums. On election of that monthly option, FIE issued the Monthly Payment Agreement endorsement (form No. E0022), amending the term of the policy from six months to one month. Therefore, the end result was that the class members did not have an FIE policy for a six-month term for which they paid monthly installments toward a six-month premium, but instead they had a one-month term for which they paid the stated premium in full (in addition to the service charge). The fact the Monthly Payment Agreement provided that class members had the right to extend the term of the one-month policy "for successive monthly periods if the premium is paid when due" supports, rather than weighs against, our conclusion. That language shows "the premium" is payable for the policy's one-month term. That agreement also provided: "*The premium* is due no later than on the expiration date of the then current monthly period." (Italics added.) That language likewise shows "the premium" is payable for the policy's one-month term. Furthermore, we note the Monthly Payment Agreement does not use the term "installment" or any other language that would suggest an insured will be paying each month only part of a greater premium for a period of coverage longer than one month (e.g., six months).

---

[9] The apparent separate meanings of the terms "premium" and "service fees" in section 1153, subdivision (b), cited by Farmers regarding qualification of newly formed insurance companies, does not require, or persuade us to reach, a different conclusion.

We conclude neither the Monthly Payment Agreement nor any of the other policy documents are reasonably susceptible of the interpretation proposed by Farmers.[10] Rather, the policy documents are reasonably susceptible of only one interpretation—that each class member had a policy for a *one-month*, and not a six-month, term. Farmers' various machinations or devices (e.g., initially offering the class members a six-month term policy and then requiring them to enter into the Prematic Agreement with, and pay service charges to, Prematic to obtain a one-month term policy) do not obscure the fact the class members ultimately obtained a one-month term policy (albeit renewable monthly) for which FIE *required* them to pay a service charge (albeit to Prematic) in addition to making payment in full of the stated premium for that one-month term. Therefore, the policy documents support our conclusion that in the circumstances of this case the term "premium," for purposes of section 381, subdivision (f), is the amount the class members were required to pay for insurance coverage for a one-month term (i.e., the stated premium plus the service charge imposed for payment in full of that stated premium). Accordingly, we are not persuaded by Farmers' assertion that the plain meaning of the policy documents is class members paid monthly *installments* of premium for which monthly service charges were imposed.

### D

None of the cases or other authorities cited by Farmers persuade us the term "premium," as used in section 381, subdivision (f), does not include a service charge imposed for payment in full of the stated premium for a period of coverage (e.g., a one-month term). Contrary to Farmers' assertion, *Auto Club* is factually inapposite and does not support Farmers' position. In that case, the class members elected to pay the premiums for their one-year term policies in monthly installments, subject to additional charges for interest on the unpaid premium balance. (*Auto Club, supra*, 148 Cal.App.4th at p. 1222.) We held: "[T]he plain and ordinary meaning of the term 'premium,' as used in section 381, subdivision (f), does *not* include interest charged for the time value of money for utilizing the option of making payments of the annual premium in installments . . . ."[11] (*Auto Club, supra*, 148 Cal.App.4th

---

[10] We disagree with Farmers' assertion that "Troyk agreed to pay *FIE* a premium to secure insurance for a six-month term." Rather, as shown by the Monthly Payment Agreement, Troyk agreed to pay FIE a premium for a *one-month* term (albeit a renewable monthly term).

[11] In an introductory paragraph in *Auto Club*, we stated: "Because we conclude the term 'premium,' as used in section 381, subdivision (f), does not include charges imposed for making payments of the annual premium in installments, [the insurer] did not violate that statute . . . ." (*Auto Club, supra*, 148 Cal.App.4th at p. 1221.) Because of the factual context of *Auto Club*, that generalized statement should be interpreted narrowly to apply only to interest charged for the time value of money because of an insured's election of an option to pay the premium for a certain period of coverage in installments over time. We did *not* address whether, much less conclude that, *all* charges, termed "service" or otherwise, imposed for the

at p. 1237, fn. omitted.) Because in the instant case the class members paid service charges for payment *in full* of the premiums due for their one-month term policies, this case, unlike *Auto Club*, does *not* involve either payment of premium in installments over the period of coverage or any interest charged for the time value of money for making payments in installments. Accordingly, neither our holding nor our underlying reasoning in *Auto Club* provides support for Farmers' contention.[12]

Similarly, we conclude the cases Farmers cite from other jurisdictions are also factually inapposite and do not support their position. (See, e.g., *Blanchard v. Allstate Ins. Co.* (La.Ct.App. 2000) 774 So.2d 1002; *Cacamo v. Liberty Mut. Fire Ins. Co.* (La.Ct.App. 2004) 885 So.2d 1248; *Nakashima v. State Farm Mut. Auto. Ins. Co.* (Ct.App. 2007) 2007 NMCA 27 [141 N.M. 239, 153 P.3d 664].) Unlike the instant case, all of those cases involved true installment payments of premium.

We also are not persuaded to reach a different conclusion because of the State of California's Department of Insurance's (DOI) purported long-standing administrative practice regarding monthly installment service charges. In particular, Farmers submitted the declaration of Milo Pearson in support of their motion for summary judgment. In his declaration, Pearson, a former DOI deputy commissioner, explained that, after the passage of Proposition 103 in 1988, the DOI treated monthly service charges as separate from premiums for purposes of automobile insurance rate approval. Assuming arguendo Pearson's declaration accurately describes DOI's past practices, we nevertheless are not persuaded to reach a different conclusion in this case because that purported past practice of the DOI involved service charges for true installment payments of premium over time, unlike the charges in this case. Furthermore, that purported past practice involved DOI rate approval, which involves a different purpose than the consumer protection policy disclosures required by section 381. In any event, the DOI's purported past practices do not control our de novo determination of the question of law on the meaning of the term "premium," as used in section 381, subdivision (f).

Similarly, we do not rely on the DOI's opinion letter dated April 25, 2006, which Troyk cites, in reaching our conclusion on the meaning of the term "premium," as used in section 381, subdivision (f). We discussed that opinion letter in *Auto Club* and concluded we were not bound by the DOI's

payment of a premium for a certain period of coverage in installments over time are not "premium," as used in section 381, subdivision (f).

[12] Contrary to Farmers' assertion, our analysis in *Auto Club* regarding interest charged for the time value of money to compensate for an insurer's lost investment income does *not* apply with equal force to the service charges imposed by FIE in this case for the administrative services of billing and collecting the premiums for the class members' one-month term policies.

administrative interpretation of statutory language, which is a question of law for our independent determination. (*Auto Club, supra,* 148 Cal.App.4th at pp. 1235–1237.) Furthermore, as we stated in *Auto Club,* "because the DOI has not issued a formal regulation or had a long-standing opinion on that question . . . , we do not defer to the DOI's opinion. [Citations.]" (*Id.* at p. 1236.) Rather than restating our reasoning for not relying on the DOI's opinion letter, we incorporate herein the reasoning we expressed in *Auto Club.* (*Id.* at pp. 1235–1237.)

Also, as in *Auto Club,* we do not rely on the taxation cases cited by Troyk and relied on by the trial court. (See, e.g., *Metropolitan Life Ins. Co. v. State Bd. of Equalization, supra,* 32 Cal.3d 649; *Allstate Ins. Co. v. State Board of Equal.* (1959) 169 Cal.App.2d 165 [336 P.2d 961]; *Interinsurance Exchange v. State Bd. of Equalization* (1984) 156 Cal.App.3d 606 [203 Cal.Rptr. 74].) Because those cases involve the interpretation of the term "gross premiums" for purposes of insurance company taxation and are otherwise factually inapposite, we do not rely on those taxation cases in interpreting the meaning of the term "premium," as used in section 381, subdivision (f). (*Auto Club, supra,* 148 Cal.App.4th at pp. 1232–1234.) Similarly, although Troyk cites two California Attorney General opinions in support of his position, "both opinions related to the definition of 'gross premiums' in the context of insurance company taxation. (See 9 Ops.Cal.Atty.Gen. 257 (1947); 58 Ops.Cal.Atty.Gen. 768 (1975).) Therefore, those opinions are factually and legally inapposite . . . ." (*Auto Club,* at p. 1235.) Accordingly, we do not rely on those opinions in interpreting the meaning of the term "premium," as used in section 381, subdivision (f).

E

■ Contrary to Farmers' assertion, the "rule of lenity" does not apply in this case. When language of a criminal statute is reasonably susceptible of two interpretations, the rule of lenity ordinarily supports an interpretation of that language favorable to a party who may be subject to criminal prosecution or penalties. (See, e.g., *Harrott v. County of Kings* (2001) 25 Cal.4th 1138, 1154 [108 Cal.Rptr.2d 445, 25 P.3d 649]; *People v. Garcia* (1999) 21 Cal.4th 1, 10–11 [87 Cal.Rptr.2d 114, 980 P.2d 829]; *People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 312 [58 Cal.Rptr.2d 855, 926 P.2d 1042]; *People v. Overstreet* (1986) 42 Cal.3d 891, 896 [231 Cal.Rptr. 213, 726 P.2d 1288].) Farmers argue that because section 383 subjects FIE (and possibly FGI) to potential criminal prosecution or penalties for violation of section 381, subdivision (f), the rule of lenity applies in this case. Section 383 provides: "It is a misdemeanor: [¶] (a) For any insurer, or any agent of any insurer, to issue a policy in violation of the requirements of subdivision (f) of section 381. . . ." ■ However, because the meaning of the term

"premium," as used in section 381, subdivision (f), is clear and unambiguous and *not* reasonably susceptible to the interpretation proposed by Farmers, as discussed above, there is no ambiguity in section 381's language that would require us to consider the rule of lenity. (*Auto Club, supra*, 148 Cal.App.4th at p. 1237, fn. 15; *Garcia*, at pp. 10–11; *Lungren*, at p. 312; *Overstreet*, at p. 896.) In any event, because the two possible interpretations cited by Farmers do not "stand in relative equipoise" on consideration of the legislative intent of consumer protection underlying section 381, subdivision (f), the rule of lenity would not apply to require adoption of the interpretation proposed by Farmers. (*People v. Jones* (1988) 46 Cal.3d 585, 599 [250 Cal.Rptr. 635, 758 P.2d 1165]; see *People v. Avery* (2002) 27 Cal.4th 49, 58 [115 Cal.Rptr.2d 403, 38 P.3d 1].)

F

Our interpretation of the term "premium," as used in section 381, subdivision (f), does not necessarily conflict with other provisions of the Insurance Code. Although Farmers cite various Insurance Code provisions (i.e., §§ 383.5, 480, 481, 1153, subd. (b), 1861.02, subd. (a)), they do not persuade us those provisions both have the same legislative purpose as section 381, subdivision (f), and use the term "premium" in a manner necessarily inconsistent with our interpretation of that term as used in section 381, subdivision (f). Therefore, the general rule favoring consistent interpretation of a term used throughout a code does not apply. (*Hassan v. Mercury American River Hospital* (2003) 31 Cal.4th 709, 716 [3 Cal.Rptr.3d 623, 74 P.3d 726]; *People v. Roberge* (2003) 29 Cal.4th 979, 987 [129 Cal.Rptr.2d 861, 62 P.3d 97].)

III

*Compliance with Section 381, Subdivision (f)*

Farmers contend that, even if the service charge imposed in this case is premium required to be disclosed in the policy, FIE complied, either actually (because of incorporation by reference to other documents) or substantially, with section 381, subdivision (f)'s disclosure requirement.

A

Farmers argue FIE *actually* complied with section 381, subdivision (f)'s requirement that the service charge, as part of premium, be disclosed in the policy because the policies FIE issued to Troyk and the other class members incorporated by reference other documents that disclosed the service charge.

Therefore, although the policies on their face did not expressly disclose the service charge, the policies' reference to other documents that did, in fact, expressly disclose the service charge resulted in actual compliance with section 381, subdivision (f)'s disclosure requirement.

■ "A contract may validly include the provisions of a document not physically a part of the basic contract. . . . 'It is, of course, the law that the parties may incorporate by reference into their contract the terms of some other document. [Citations.] But each case must turn on its facts. [Citation.] For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties.' " (*Williams Constr. Co. v. Standard-Pacific Corp.* (1967) 254 Cal.App.2d 442, 454 [61 Cal.Rptr. 912].) "The contract need not recite that it 'incorporates' another document, so long as it 'guide[s] the reader to the incorporated document.' [Citations.]" (*Shaw v. Regents of University of California* (1997) 58 Cal.App.4th 44, 54 [67 Cal.Rptr.2d 850].)

■ Assuming arguendo that the doctrine of incorporation by reference can apply in the context of the insurance policy disclosures required by section 381 (and we have our doubts that it can), we nevertheless conclude the policies in this case did not clearly and unequivocally refer to and incorporate the service charge (i.e., part of premium) disclosed only in the Prematic Agreement and Prematic's bills.[13] Farmers argue the doctrine of incorporation by reference applies in this case because FIE's declarations page "guided" Troyk and the class members to the Prematic Agreement and Prematic's monthly bills, both of which fully disclosed the service charge. Our review of Troyk's declarations page (which presumably also represents the class members' declarations pages) shows it contains only two references to Prematic: (1) "PREMATIC NO[.] A641249" appears below the section listing the policy number and effective period of coverage; and (2) "PREMATIC" appears in the "policy activity" section adjacent to the

---

[13] Although we need not, and do not, decide whether incorporation by reference to a nonpolicy document can be sufficient to comply with section 381, subdivision (f), we doubt the legislative purpose of that statute would be satisfied were premium, or part of premium, stated only in a nonpolicy document. As stated above, section 381, subdivision (f), is a consumer protection statute requiring disclosure of premium in a policy: "A policy shall specify: [¶] . . . [¶] (f) . . . [¶] (1) A statement of the premium . . . ." (§ 381, subd. (f).) It is difficult to comprehend how section 381's legislative purpose requiring disclosure of premium in a policy could be satisfied by instead stating that premium in a nonpolicy document, albeit one incorporated by reference.

word "Total."[14] Although the declarations page contained those truncated, vague and obtuse references to "Prematic," we conclude they were insufficient to clearly and unequivocally evidence an intent that the Prematic Agreement (including its disclosure of the service charge), or Prematic's monthly bills, be incorporated into the declarations page or other policy document. (*Williams Constr. Co. v. Standard-Pacific Corp., supra*, 254 Cal.App.2d at p. 454; cf. *Fogel v. Farmers Group, Inc.* (2008) 160 Cal.App.4th 1403, 1420 [74 Cal.Rptr.3d 61] [policy's reference to a power of attorney did *not* incorporate by reference the subscription agreement naming FGI as the subscribers/insureds' attorney-in-fact].) Furthermore, "any ambiguity or uncertainty in an insurance policy is to be resolved against the insurer." (*Continental Cas. Co. v. Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 437 [296 P.2d 801].) To the extent the references in the declarations page were ambiguous or uncertain regarding incorporation of the Prematic Agreement and Prematic's bills, we resolve that ambiguity or uncertainty against FIE. (*Ibid.*) Accordingly, we reject Farmers' assertion that the policy *actually* disclosed the service charge by incorporating by reference the Prematic Agreement and Prematic's bills.[15]

## B

Farmers also argue they *substantially* complied with section 381, subdivision (f), because FIE, at most, only technically deviated from section 381, subdivision (f)'s disclosure requirement. They argue that because Troyk and the other class members were, in fact, aware of the service charge imposed pursuant to the Prematic Agreement and Prematic's bills, FIE substantially complied with section 381, subdivision (f).

■ " 'Substantial compliance, as the phrase is used in the decisions, means *actual* compliance in respect to the substance essential to every reasonable objective of the statute.' [Citation.] Where there is compliance as

[14] We also note the "policy activity" section of Troyk's declarations page for the period beginning April 14, 2005, includes "$421.60" adjacent to the word "Premium," which amount presumably represents the policy's aggregate stated premium without any service charge for 6 one-month terms, because the declarations page also includes a reference to endorsement form No. E0022 (Monthly Payment Agreement) amending the policy to a one-month term as discussed above. Furthermore, that "policy activity" section is blank and contains no figure adjacent to the word "Fees," which would lead a reasonable person to believe there are no fees (e.g., service fees or charges) due or payable in addition to the stated aggregate premium of $421.60.

[15] Likewise, we reject Farmers' alternative, albeit similar, argument that FIE complied with section 381, subdivision (f)'s disclosure requirement because the policy must be considered and construed together with the Prematic Agreement, executed at the same time as the policy. (Cf. *Harm v. Frasher* (1960) 181 Cal.App.2d 405, 412–413 [5 Cal.Rptr. 367].) We conclude that general rule of construction of contracts does not supersede the more specific statutory requirement for disclosure in insurance policies set forth in section 381, subdivision (f).

to all matters of substance[,] technical deviations are not to be given the stature of noncompliance. [Citation.] Substance prevails over form. When the plaintiff embarks [on a course of substantial compliance], every reasonable objective of [the statute at issue] has been satisfied." (*Southern Pac. Transportation Co. v. State Bd. of Equalization* (1985) 175 Cal.App.3d 438, 442 [221 Cal.Rptr. 12].) "Thus, the doctrine gives effect to our preference for substance over form, but it does not allow for an excuse to literal noncompliance in every situation." (*Robertson v. Health Net of California, Inc.* (2005) 132 Cal.App.4th 1419, 1430 [34 Cal.Rptr.3d 547].) Furthermore, the doctrine of substantial compliance does *not* apply at all when a statute's requirements are *mandatory*, instead of merely directory. (*Ibid.*; *D'Agostino v. Superior Court* (1995) 33 Cal.App.4th 107, 117 [39 Cal.Rptr.2d 112].) A mandatory statute "is one that is essential to the promotion of the overall statutory design and thus does not permit substantial compliance. [Citation.]" (*Robertson*, at p. 1430.)

■ We conclude section 381, subdivision (f)'s disclosure requirement is *mandatory* and not merely directory. Section 381, subdivision (f), requires that an insurance policy state the premium for insurance coverage. As we discussed above, that statute is a consumer protection statute. Therefore, it requires an *express statement in* an insurance *policy* of the *premium* charged by an insurer and does so presumably to protect consumers from confusion regarding the premium charged and to discourage insurers from misleading consumers regarding the amount of premium charged. Furthermore, that express statement of premium in a policy allows a consumer to easily compare that premium with premiums charged by other insurers for the same coverage, thereby promoting healthy comparison shopping by consumers and presumably encouraging insurers to offer competitive premiums for their insurance. Were insurers allowed, by substantial compliance or otherwise, to state all or part of a premium in documents other than a policy, those underlying purposes of section 381, subdivision (f), would not be promoted. Because section 381, subdivision (f)'s disclosure requirement is essential to the overall promotion of the statutory design, we conclude that statute's disclosure requirement is *mandatory*. (*Robertson v. Health Net of California, Inc., supra*, 132 Cal.App.4th at p. 1430.) Accordingly, the doctrine of substantial compliance does not apply to the disclosures required by section 381, subdivision (f). (*Robertson*, at p. 1430; *D'Agostino v. Superior Court, supra*, 33 Cal.App.4th at p. 117.)

In any event, even if section 381, subdivision (f)'s disclosure requirement is not mandatory, we nevertheless would conclude that FIE did not actually comply in respect to the substance essential to every reasonable objective of the statute. (*Southern Pac. Transportation Co. v. State Bd. of Equalization,*

*supra*, 175 Cal.App.3d at p. 442.) In the circumstances of this case, FIE did *not* state anywhere in the policy the service charge it required for full payment of the premium it stated in the policy. The amount of the service charge was not stated anywhere in the main policy, declarations page, or endorsements. Furthermore, none of the policy documents contain any reference to that service charge, nor do they disclose that the service charge is really part of the premium charged for the insurance coverage provided by FIE. The only statements of the amount of, and other information regarding, the service charge are set forth in nonpolicy documents (e.g., the Prematic Agreement and Prematic's bills). We conclude FIE did not actually comply in respect to the substance essential to every reasonable objective of section 381, subdivision (f), which objectives we discussed above. (*Southern Pac. Transportation Co.*, at p. 442; cf. *Allstate Ins. Co. v. Dean* (1969) 269 Cal.App.2d 1, 3–4 [76 Cal.Rptr. 543]; *Robertson v. Health Net of California, Inc., supra*, 132 Cal.App.4th at pp. 1430–1431; *Malek v. Blue Cross of California* (2004) 121 Cal.App.4th 44, 72–73 [16 Cal.Rptr.3d 687].) Farmers have not shown FIE substantially complied with section 381, subdivision (f)'s disclosure requirement.[16]

IV

*UCL Cause of Action*

Farmers contend the trial court erred by concluding Troyk met his burden in moving for summary judgment by showing there were no triable issues of material fact and that he and the class members were entitled to judgment as a matter of law on the UCL cause of action. (Code Civ. Proc., § 437c, subd. (c); *Aguilar, supra*, 25 Cal.4th at p. 843.)

A

In *Smith v. Wells Fargo Bank, N.A.* (2005) 135 Cal.App.4th 1463 [38 Cal.Rptr.3d 653], we described the basis for a UCL cause of action:

 "[Business and Professions Code] [s]ection 17200 of the UCL defines 'unfair competition' as 'any unlawful, unfair or fraudulent business

---

[16] The cases cited by Farmers are factually and legally inapposite and do not persuade us to reach a contrary conclusion. (See, e.g., *Asdourian v. Araj* (1985) 38 Cal.3d 276 [211 Cal.Rptr. 703, 696 P.2d 95]; *Cal-Air Conditioning, Inc. v. Auburn Union School Dist.* (1993) 21 Cal.App.4th 655 [26 Cal.Rptr.2d 703]; *Stasher v. Harger-Haldeman* (1962) 58 Cal.2d 23 [22 Cal.Rptr. 657, 372 P.2d 649]; *Henricks v. Metropolitan Life Ins. Co.* (1936) 7 Cal.2d 619 [61 P.2d 1162].) Furthermore, the fact Troyk knew of the service charge because he signed the Prematic Agreement and received Prematic's monthly bills does not show he knew the service charge was not disclosed as premium in his policy as required by section 381, subdivision (f).

act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with [Business and Professions Code] Section 17500) of Part 3 of Division 7 . . . .' Therefore, an act or practice is 'unfair competition' under the UCL if it is forbidden by law or, even if not specifically prohibited by law, is deemed an unfair act or practice. As the California Supreme Court stated in *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, at page 1143 [131 Cal.Rptr.2d 29, 63 P.3d 937]: '[Business and Professions Code] [s]ection 17200 "borrows" violations from other laws by making them independently actionable as unfair competitive practices. [Citation.] In addition, under [Business and Professions Code] section 17200, "a practice may be deemed unfair even if not specifically proscribed by some other law." [Citation.]' The remedies available under the UCL are 'cumulative . . . to the remedies or penalties available under all other laws of this state.' ([Bus. & Prof. Code,] § 17205.) 'Under [Business and Professions Code] [section 17204], a private plaintiff may bring a UCL action even when "the conduct alleged to constitute unfair competition violates a statute for the direct enforcement of which there is no private right of action." [Citation.]' (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 950 [119 Cal.Rptr.2d 296, 45 P.3d 243], quoting *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* [(1998) 17 Cal.4th 553,] 565 [71 Cal.Rptr.2d 731, 950 P.2d 1086].) '[I]n enacting the UCL itself, and not by virtue of particular predicate statutes, . . . the Legislature has conferred upon private plaintiffs "specific power" [citation] to prosecute unfair competition claims.' (*Stop Youth Addiction, Inc., supra*, at p. 562.)

"By 'borrowing' violations of other laws, the UCL deems those violations 'unfair competition' independently actionable under the UCL. (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527].) 'Virtually any law— federal, state or local—can serve as a predicate for a [Business and Professions Code] section 17200 action. [Citation.]' (*State Farm Fire & Casualty Co. v. Superior Court* (1996) 45 Cal.App.4th 1093, 1102–1103 [53 Cal.Rptr.2d 229], disapproved on another ground in *Cel-Tech*, at pp. 184–185.)" (*Smith v. Wells Fargo Bank, N.A., supra*, 135 Cal.App.4th at pp. 1479–1480, fn. omitted.) As we noted in *Smith*, "on November 2, 2004, Proposition 64 passed, amending [Business and Professions Code] section 17204 to delete language expressly authorizing any person acting for the interests of the general public to bring a UCL cause of action, and to add language expressly authorizing 'any person who has suffered injury in fact and has lost money or property as a result of such unfair competition' to bring a UCL cause of action."[17] (*Smith v. Wells Fargo Bank, N.A., supra*, 135 Cal.App.4th at p. 1480, fn. 13.)

---

[17] We separately address below the question of Troyk's standing to prosecute his UCL cause of action.

B

Farmers initially argue that neither FIE nor FGI engaged in any predicate unlawful business practice or conduct that could constitute unfair competition and provide a basis for a UCL cause of action. They argue Troyk did not show FIE and FGI violated section 381, subdivision (f), which alleged violation would provide the predicate unlawful business practice or conduct for a UCL cause of action.[18] However, as we concluded above, in the circumstances of this case the term "premium," as used in section 381, subdivision (f), is the amount Troyk and the other class members were required to pay for insurance coverage for a one-month term (i.e., the premium stated in the policy plus the service charge required for payment in full of that stated premium). The service charges FIE required Troyk and the other class members to pay were *not* imposed for the privilege of paying a six-month term premium in monthly installments or otherwise over time. Rather, as shown by the Monthly Payment Agreement endorsement (form No. E0022), the policies issued to the class members were for one-month terms, not six-month terms. Furthermore, we concluded above that the policy documents issued by FIE to the class members did not either actually or substantially comply with section 381, subdivision (f)'s disclosure requirement. Because none of the policy documents (i.e., main policy, declarations page, and endorsements) disclosed the service charge that FIE required the class members to pay (albeit to Prematic) when paying in full the stated premium for their one-month terms, FIE violated section 381, subdivision (f). That predicate statutory violation is an unlawful business practice constituting unfair competition under the UCL.

Although FGI apparently does not contend on appeal that it, as FIE's agent and attorney-in-fact, cannot be found to be liable together with FIE for FIE's violation of section 381, subdivision (f), and resultant unfair competition under the UCL, we nevertheless briefly address that issue. As FIE's attorney-in-fact, FGI performed managerial, underwriting, and administrative services for FIE, a reciprocal or interinsurance exchange. As noted in *Fogel*, "[t]he interinsurance exchange [i.e., FIE] is *managed* by the attorney-in-fact [i.e., FGI] . . . ."[19] (*Fogel v. Farmers Group, Inc., supra*, 160 Cal.App.4th at

---

[18] Farmers apparently do not, and could not successfully, argue that a violation of section 381, subdivision (f), cannot constitute a predicate unlawful business practice or conduct for a UCL cause of action.

[19] Likewise, one court stated: "The attorney-in-fact acts as the insurer's *managerial* agent . . . ." (*Tran v. Farmers Group, Inc.* (2002) 104 Cal.App.4th 1202, 1206 [128 Cal.Rptr.2d 728], italics added.) *Tran* further stated: "The attorney-in-fact executes the exchange's insurance contracts. [Citations.]" (*Id.* at p. 1210.) "[A] present-day interinsurance exchange is managed by an attorney-in-fact . . . ." (*Lee v. Interinsurance Exchange* (1996) 50 Cal.App.4th 694, 704 [57 Cal.Rptr.2d 798].) An attorney-in-fact's functions were explained in *Industrial Indem. Co. v. Golden State Co.* (1953) 117 Cal.App.2d 519 [256 P.2d 677]: "A reciprocal

p. 1407, italics added.) *Delos v. Farmers Group, Inc.* (1979) 93 Cal.App.3d 642 [155 Cal.Rptr. 843] stated: "[FGI] was formed to render management services for [FIE] for which [FGI] received a percentage of premiums paid by [FIE's] policyholders." (*Id.* at p. 652.) In particular, FGI, as FIE's managing arm, presumably drafted the policy documents in this case and executed the class members' policies on FIE's behalf.[20] Therefore, because FGI, as FIE's managing agent, was directly involved in the drafting and execution of the class members' policies, it must at least share with FIE responsibility for the UCL unlawful business practice resulting from FIE's violation of section 381, subdivision (f).

Furthermore, section 1281 provides: "Reciprocal or interinsurance contracts, the exchange thereof, the subscribers, *attorneys in fact*, agents, and representatives, and all matters incident to or concerned with such contracts and relationship, *shall be subject to and regulated by all of the provisions of this code*, whether or not such provisions specifically refer to reciprocals or interinsurance exchanges, except as otherwise exempted in this chapter."[21] (Italics added.) Because FGI, as FIE's attorney-in-fact, presumably directly drafted, or at least managed and approved the drafting of, the policy documents for the class members, FGI is "subject to and regulated by" section 381, subdivision (f)'s disclosure requirement and is therefore liable for any violation of that statute. (§ 1281.) Accordingly, there can be no reasonable dispute that FGI may be liable for the violation of section 381, subdivision (f), based on FIE's failure to disclose the service charge in the class members' policies.[22] Because FGI may be liable for the instant violation of section 381, subdivision (f), it likewise may be liable, together with FIE, for the UCL unlawful business practice based on that violation.[23]

---

insurance exchange . . . is an unincorporated business organization of a special character in which the . . . subscribers . . . exchange insurance contracts through the medium of an attorney-in-fact, empowered . . . not only to exchange insurance contracts for the subscribers, but also to exercise all other functions of an insurer, e.g., to set rates, to settle losses, to compromise claims, to cancel contracts. . . . The attorney-in-fact receives a sizable percentage of the premiums deposited in consideration of which he does not only provide his own services, but also has to defray many of the costs of the business." (*Id.* at pp. 522–523.)

[20] The signature page of Troyk's policy shows that FGI (also known as Farmers Underwriters Association) signed the policy on FIE's behalf.

[21] We also note that attorneys-in-fact must obtain a certificate of authority from, and are subject to examination and supervision by, the DOI. (See, e.g., §§ 1350, 1431, 1432.)

[22] To the extent FGI argues it is not subject to, or cannot be liable for a violation of, section 381, subdivision (f), because it is not an "insurer" under the Insurance Code, we disagree. Although FGI is not an insurer, section 381, subdivision (f)'s provisions do not apply solely to insurers, but also to an insurer's attorney-in-fact who drafted, or at least managed and approved the drafting of, a policy that does not disclose the "premium" for insurance. (§ 1281.)

[23] Because we conclude Troyk met his burden to show Farmers committed an unlawful business practice under the UCL, we need not, and do not, address the two alternative bases

C

 Farmers also argue the trial court abused its discretion in awarding the class members restitution of the service charges they paid to Prematic during the class period. Farmers argue restitution cannot be awarded against them because the service charges were paid *directly* to Prematic and not to either FGI or FIE. In support of their argument, they selectively cite language from *Korea Supply Co. v. Lockheed Martin Corp., supra,* 29 Cal.4th 1134: "Any award that plaintiff would recover from defendants would not be restitutionary as it would not replace any money or property that defendants took directly from plaintiff." (*Id.* at p. 1149.) However, that language was parsed from the facts and analysis in that case, which involved money in which the plaintiff never had a vested interest and for which the plaintiff, in effect, sought disgorgement, rather than restitution, from the defendant. (*Id.* at pp. 1148–1150.) Therefore, we conclude *Korea Supply* is inapposite to our case and does *not* hold that a plaintiff who paid a third party money (i.e., money in which the plaintiff had a vested interest) may not seek UCL restitution from a defendant whose unlawful business practice caused the plaintiff to pay that money. As *Shersher v. Superior Court* (2007) 154 Cal.App.4th 1491 [65 Cal.Rptr.3d 634] stated: "The message of *Korea Supply* is that 'in the UCL context . . . restitution means the return of money to those persons from whom it was taken or who had an ownership interest in it.' [Citation.]" (*Shersher,* at p. 1497, quoting *Madrid v. Perot Systems Corp.* (2005) 130 Cal.App.4th 440, 455 [30 Cal.Rptr.3d 210].)

Business and Professions Code section 17203 provides for restitution under the UCL: "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. *The court may make such orders* or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or *as may be necessary to restore to any person in interest any money* or property, real or personal, which may have been acquired by means of such unfair competition. Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of [Business and Professions Code] Section 17204 . . . ."[24] (Italics added.) As

---

for unfair competition under the UCL (i.e., whether Farmers also engaged in fraudulent or unfair business practices). (Bus. & Prof. Code, § 17200; *Smith v. Wells Fargo Bank, N.A., supra,* 135 Cal.App.4th at p. 1480.)

[24] Business and Professions Code section 17535 also provides: "The court may make such orders or judgments . . . which may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of any practice in this chapter declared to be unlawful."

noted above, since the passage of Proposition 64 in 2004, a private individual has standing to bring a UCL action only if he or she "has suffered injury in fact and has lost money or property as a result of the unfair competition."[25] (Bus. & Prof. Code, § 17204.) "Through the UCL a plaintiff may obtain restitution and/or injunctive relief against unfair or unlawful practices in order to protect the public and restore to the parties in interest money or property taken by means of unfair competition." (*Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 126 [96 Cal.Rptr.2d 485, 999 P.2d 718].) "A UCL action is an equitable action by means of which a plaintiff may recover money or property obtained from the plaintiff or persons represented by the plaintiff through unfair or unlawful business practices." (*Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 173 [96 Cal.Rptr.2d 518, 999 P.2d 706].) "[A] court of equity may exercise the full range of its inherent powers in order to accomplish complete justice between the parties, restoring if necessary the *status quo ante* as nearly as may be achieved." (*People v. Superior Court* (1973) 9 Cal.3d 283, 286 [107 Cal.Rptr. 192, 507 P.2d 1400].)

 *County of Solano v. Vallejo Redevelopment Agency* (1999) 75 Cal.App.4th 1262 [90 Cal.Rptr.2d 41] discussed the remedy of restitution: " 'A person who has been unjustly enriched at the expense of another is required to make restitution to the other.' (Rest., Restitution, § 1.) 'A person is enriched if he receives a benefit at another's expense. (*Id.*, com. a, p. 12.) The term "benefit" "denotes any form of advantage." (*Id.*, com. b, p. 12.) Thus, a benefit is conferred not only when one adds to the property of another, but also when one saves the other from expense or loss. Even when a person has received a benefit from another, he is required to make restitution "only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it." (*Id.*, com. c, p. 13.)' (*Ghirardo v. Antonioli* (1996) 14 Cal.4th 39, 51 [57 Cal.Rptr.2d 687, 924 P.2d 996] (*Ghirardo*).) 'For a benefit to be conferred, *it is not essential that money be paid directly to the recipient by the party seeking restitution.*' (*California Federal Bank v. Matreyek* (1992) 8 Cal.App.4th 125, 132 [10 Cal.Rptr.2d 58] (*Matreyek*).)" (*County of Solano*, at p. 1278, italics added.) In that case, the court concluded that although "Vallejo was not a party to the agreement between the Agency and Solano County, it set in motion the actions of the Agency to contract with Solano County for the redevelopment . . . ." (*County of Solano*, at pp. 1279–1280.) Because Vallejo was enriched because of the Agency's payments to a third party (payments known to Vallejo), the court held Vallejo was unjustly enriched and therefore affirmed the judgment awarding the County of Solano restitution against Vallejo. (*Id.* at p. 1280.)

---

[25] As noted above, we separately address below the question of Troyk's standing to prosecute his UCL cause of action.

Accordingly, case law does not support Farmers' argument that they cannot be liable for restitution under the UCL because Prematic, rather than FIE or FGI, was the direct recipient of the service charges. (*County of Solano v. Vallejo Redevelopment Agency, supra,* 75 Cal.App.4th at pp. 1279–1280; see also *Hirsch v. Bank of America* (2003) 107 Cal.App.4th 708, 721–722 [132 Cal.Rptr.2d 220]; *Shersher v. Superior Court, supra,* 154 Cal.App.4th at p. 1500 [UCL restitution does not require money be paid directly to defendant]; *Matoff v. Brinker Restaurant Corp.* (C.D.Cal. 2006) 439 F.Supp.2d 1035, 1038 ["If Defendant unlawfully misappropriated Plaintiff's tips, Plaintiff may seek [UCL] restitution even if Defendant directed the misappropriated funds to the bartenders."].) The UCL "requires only that the plaintiff must once have had an ownership interest in the money or property acquired by the defendant through unlawful means." (*Shersher, supra,* at p. 1500.) In *Shersher,* the court held that the plaintiff therefore could state a UCL cause of action for restitution against a manufacturer even though the plaintiff purchased the product from, and paid money directly to, a retailer. (*Shersher,* at pp. 1494, 1500.)

In the circumstances of this case, although the class members did not pay the service charges directly to either FGI or FIE, the trial court could have properly inferred from the undisputed facts that FGI and FIE received a benefit from those service charge payments (which FIE and FGI required) even though they did not directly receive money. As noted above, Prematic was incorporated by, and is a wholly owned subsidiary of, FGI. To the extent Prematic earned profits from those service charge payments, its net worth increased and the value of FGI's stock investment in Prematic likewise increased, thereby benefiting FGI. Furthermore, the record shows Prematic paid FGI for use of FGI's equipment and personnel necessary for the performance of most of Prematic's obligations under the Prematic Agreement. Therefore, FGI received the benefit of direct revenue from Prematic for the services FGI provided to Prematic in Prematic's performance of its obligations under the Prematic Agreement. Accordingly, it can be inferred a substantial portion of the service charges paid by the class members to Prematic were indirectly received by FGI through payments made by Prematic to FGI for services rendered. Also, as we discuss below, the trial court properly exercised its equitable discretion in concluding FGI and Prematic acted as a single enterprise. Therefore, the class members' payments to Prematic should be treated as if paid to FGI. Accordingly, the trial court did not abuse its discretion by concluding FGI may be liable to the class members for restitution under the UCL.

Likewise, because Prematic was acting as FIE's agent in billing and collecting premiums and service charges from the class members, the trial

court could properly conclude FIE, as the principal, may be liable for UCL restitution for service charges paid by the class members to FIE's agent (Prematic). Contrary to Farmers' argument, the fact the Prematic Agreement ostensibly stated that Prematic was the agent of the class members did not preclude a finding that Prematic was, in fact, the agent of FIE or, at least, a dual agent of both the class members and FIE.[26] FIE required insureds who elected a one-month term policy to enter into the Prematic Agreement. Prematic is a wholly owned subsidiary of FGI, FIE's attorney-in-fact, which manages and administers FIE's insurance business. Prematic's primary, if not sole, business is to perform monthly billing and collection services for those insureds who select one-month term policies. Prematic bills those insureds for the stated premium plus a service charge and forwards the insureds' payments to FIE (less the service charge). Because in performing those services Prematic was acting as FIE's agent, the trial court did not abuse its discretion by concluding FIE, as Prematic's principal, may be liable to the class members for restitution under the UCL.

To the extent Farmers challenge the trial court's finding that FIE, FGI, and Prematic were acting as a single enterprise and therefore FIE and FGI may be liable to the class members for UCL restitution, we conclude the trial court did not abuse its discretion in so finding. The "single enterprise," or alter ego, doctrine is an equitable doctrine: "A corporate identity may be disregarded—the 'corporate veil' pierced—where an abuse of the corporate privilege justifies holding the equitable ownership of a corporation liable for the actions of the corporation. [Citation.] Under the alter ego doctrine, then, when the corporate form is used to perpetuate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations actually controlling the corporation, in most instances the equitable owners. [Citations.] The alter ego doctrine prevents individuals or other corporations from misusing the corporate laws by the device of a sham corporate entity formed for the purpose of committing fraud or other misdeeds. [Citation.]" (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538 [99 Cal.Rptr.2d 824].) "In California, two conditions must be met before the alter ego doctrine will be invoked. First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist. Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone. [Citations.]" (*Id.* at p. 538.) Alter ego liability is not limited to the parent-subsidiary corporate relationship; rather, "under the single-enterprise rule, liability can [also] be found between sister [or affiliated] companies." (*Las*

---

[26] The Prematic Agreement states: "The customer hereby appoints [Prematic] as his agent to budget monthly payment of premiums on all eligible policies . . . ."

*Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1249 [1 Cal.Rptr.2d 301].) Factors for the trial court to consider include the commingling of funds and assets of the two entities, identical equitable ownership in the two entities, use of the same offices and employees, disregard of corporate formalities, identical directors and officers, and use of one as a mere shell or conduit for the affairs of the other. (*Sonora Diamond*, at pp. 538–539.) "No one characteristic governs, but the courts must look at all the circumstances to determine whether the doctrine should be applied. [Citation.]" (*Id.* at p. 539.)

Based on our review of the undisputed facts, we conclude there is substantial evidence to support the trial court's finding that FGI, FIE, and Prematic acted as a single enterprise and therefore FGI and FIE may be liable for UCL restitution. Prematic is a wholly owned subsidiary of FGI and all of its directors are officers or employees of FGI. Prematic performs most of its billing and forwarding activities by using FGI's equipment and personnel and pays FGI for such use. More importantly, FGI, as FIE's managerial agent and attorney-in-fact, presumably designed and effected the scheme whereby any FIE insured who elected a one-month term policy would be required by FIE to execute the Prematic Agreement, requiring the insured to pay to Prematic not only the stated premium but also a service charge for paying in full that stated premium. Not only did FGI's actions, in combination with FIE's actions, result in a violation of section 381, subdivision (f)'s disclosure requirement, but FGI's actions also resulted in FGI effectively receiving (indirectly through Prematic) service charge revenue in addition to its contractual compensation for acting as FIE's attorney-in-fact (i.e., a certain percentage of FIE's premiums). There is substantial evidence that FGI used Prematic as a mere shell or conduit for the performance of the billing and forwarding functions for the class members for which Prematic received service charges that had been omitted from, or not disclosed as part of premium in, their policies.

Likewise, there is substantial evidence to support a finding that Prematic was an alter ego of, or acted as part of a single enterprise with, FIE. Although FIE did not control or own any shares of stock of Prematic, the trial court could reasonably infer that FGI's managerial and administrative control over FIE's activities as FIE's attorney-in-fact allowed FGI to control the activities of both FIE and Prematic, effectively making FIE and Prematic sister, or at least affiliated, entities for the purpose of applying the single enterprise doctrine to FGI's scheme to require the class members to pay service charges that were not disclosed in their policies as section 381, subdivision (f), requires.

As noted above, FIE required the class members to enter into the Prematic Agreement if they elected to obtain one-month term policies. The class members could not obtain a one-month policy without entering into the Prematic Agreement and paying to Prematic the service charge imposed for paying in full the premium stated in the policy (which stated premium did not include the service charge). That scheme presumably was created by FGI and effectively worked to FGI's benefit, resulting in FGI's receipt (through Prematic) of revenue in addition to that received from FIE for serving as FIE's attorney-in-fact. Although FIE is legally owned by its subscribers (i.e., its insureds), its business activities are effectively controlled by its managing agent and attorney-in-fact, FGI. By the nature of that relationship, the trial court could reasonably infer that, for the purposes of the instant matter, FGI controlled the actions of FIE and FIE, in turn, controlled Prematic's receipt of the service charges by requiring the class members to enter into the Prematic Agreement. FGI did not need to own FIE for application of the alter ego or single enterprise doctrine.[27]

Furthermore, the trial court could reasonably conclude that if the acts of FGI, FIE, and Prematic were treated as those of Prematic alone, an inequitable result would follow. (*Las Palmas Associates v. Las Palmas Center Associates, supra*, 235 Cal.App.3d at p. 1249; *Sonora Diamond Corp. v. Superior Court, supra*, 83 Cal.App.4th at p. 538.) Therefore, the trial court properly exercised its equitable discretion in finding FGI, FIE, and Prematic acted as a single enterprise and therefore FGI and FIE may both be liable to the class members for UCL restitution. "The essence of the alter ego doctrine is that justice be done." (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 301 [216 Cal.Rptr. 443, 702 P.2d 601].) The trial court could reasonably conclude that justice would not be done without application of the alter ego or single enterprise doctrine in the circumstances of this case. (*Ibid.*)

## D

Farmers also argue the trial court abused its discretion by awarding the class members *full* restitution of the service charges they paid during the class period. They argue the class members suffered no harm for which they should

---

[27] "An interinsurance exchange is 'owned' by the subscribers, not by the attorney-in-fact. However, given that the subscribers are required to appoint the attorney-in-fact as managerial agent, the 'ownership' element of the alter ego doctrine is not applicable in this context." (*Tran v. Farmers Group, Inc., supra*, 104 Cal.App.4th at p. 1219, fn. 7.)

receive restitution. They also argue the trial court did not adequately weigh the equities and failed to offset the restitution amount by the value of the services the class members received. Because we reverse the judgment on other grounds as discussed below, we do not address these arguments.

E

After oral argument in this appeal, we requested supplemental briefing by the parties on the issues whether (1) Troyk had standing under Business and Professions Code section 17204 to bring this action; and (2) the issue of standing was raised in the trial court by Farmers and, if not, whether that issue has been waived. We have received and considered the parties' supplemental briefs on those issues.

In their supplemental brief, Farmers contend Troyk lacks standing to bring a UCL claim because he cannot show he suffered an injury in fact and lost money as a result of unfair competition within the meaning of Business and Professions Code section 17204. Following Proposition 64's amendments in November 2004, Business and Professions Code section 17204 now provides: "*Actions for any relief* pursuant to this chapter *shall be prosecuted* exclusively in a court of competent jurisdiction by the Attorney General or any district attorney or by any county counsel authorized by agreement with the district attorney in actions involving violation of a county ordinance, or any city attorney of a city having a population in excess of 750,000, or by a city attorney in any city and county and, with the consent of the district attorney, by a city prosecutor in any city having a full-time city prosecutor in the name of the people of the State of California upon their own complaint or upon the complaint of any board, officer, person, corporation, or association, or *by any person who has suffered injury in fact and has lost money* or property *as a result of the unfair competition*." (Italics added.) *Buckland v. Threshold Enterprises, Ltd.* (2007) 155 Cal.App.4th 798 [66 Cal.Rptr.3d 543] (*Buckland*) summarized the effect of Proposition 64 on UCL class actions brought by private plaintiffs: "In November 2004, the voters of California approved Proposition 64, which amended Business and Professions Code section 17204 to provide that a private individual has standing to assert a claim under the UCL only if he or she ' "has suffered injury in fact and has lost money or property as a result of such unfair competition." ' [Citations.] Proposition 64 also amended Business and Professions Code section 17203 to provide that, aside from public officials, a person may pursue ' "representative claims or relief on behalf of others" ' only if the person meets the new standing requirement and otherwise complies with Code of Civil Procedure section 382, which governs class actions. [Citations.] These amendments imposed significant new requirements on claimants under the UCL, which had previously 'authorized any person acting for the general public to sue for

relief from unfair competition,' and did not predicate standing 'on a showing of injury or damage.' [Citation.] In approving Proposition 64, the voters found and declared that the amendments were necessary to prevent abusive UCL actions by attorneys whose clients had not been 'injured in fact' or used the defendant's product or service, and to ensure 'that only the California Attorney General and local public officials [are] authorized to file and prosecute actions on behalf of the general public.' (Prop. 64, § 1, subds. (b), (e), (f).)" (*Buckland, supra*, at pp. 812–813, fns. omitted.) Proposition 64's amended standing provisions apply to all UCL cases pending when Proposition 64 took effect (i.e., as of Nov. 3, 2004). (*Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 227 [46 Cal.Rptr.3d 57, 138 P.3d 207] (*Mervyn's*).) Therefore, because the instant action was filed in October 2004 and was pending as of November 3, 2004, Troyk must satisfy Proposition 64's amended standing provisions to prosecute the UCL cause of action on behalf of the class members in this case. (*Mervyn's*, at p. 227; *Buckland, supra*, at p. 812.)

■ "A litigant's standing to sue is a threshold issue to be resolved before the matter can be reached on the merits. [Citation.]" (*Blumhorst v. Jewish Family Services of Los Angeles* (2005) 126 Cal.App.4th 993, 1000 [24 Cal.Rptr.3d 474].) Because elements for standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation. [Citations.]" (*Lujan v. Defenders of Wildlife* (1992) 504 U.S. 555, 561 [119 L.Ed.2d 351, 112 S.Ct. 2130] (*Lujan*) [in the context of standing to invoke federal court jurisdiction].) Furthermore, "[f]or a [UCL] lawsuit properly to be allowed to continue, standing must exist at all times until judgment is entered and not just on the date the complaint is filed." (*Mervyn's, supra*, 39 Cal.4th at pp. 232–233.)

"Because standing goes to the existence of a cause of action, lack of standing may be raised by demurrer or at any time in the proceeding, including at trial or in an appeal. [Citations.]" (*Buckland, supra*, 155 Cal.App.4th at p. 813.) " '[C]ontentions based on a lack of standing involve jurisdictional challenges and may be raised at any time in the proceeding.' [Citations.]" (*Mervyn's, supra*, 39 Cal.4th at p. 233.) Accordingly, we conclude Farmers has not waived or forfeited the contention that Troyk does not have standing to prosecute the UCL cause of action and can now raise it on appeal. (*Mervyn's*, at p. 233; *Buckland, supra*, at p. 813.)

■ Troyk's first amended complaint alleges he has standing to prosecute the UCL claim, specifically alleging he "has suffered an injury in fact and has

lost money as a result of the conduct alleged." Farmers argue Troyk does not have standing to prosecute the instant UCL claim because he has not shown he suffered an "injury in fact" *or* that he has "lost money as a result of" the alleged UCL violation. Although Business and Professions Code section 17204 does not expressly define "injury in fact" for purposes of standing, Proposition 64 states: " 'The people of the State of California find and declare that: . . . (e) It is the intent of the California voters in enacting this act to prohibit private attorneys from filing lawsuits for unfair competition where they have no client who has been *injured in fact under the standing requirements of the United States Constitution.*' " (*Buckland, supra*, 155 Cal.App.4th at p. 813, fn. 6, italics added.) In so doing, the voters presumably intended to incorporate into Business and Professions Code section 17204 the definition of "injury in fact" as required for standing to bring actions in federal courts under article III of the United States Constitution. (*Buckland*, at pp. 814–815.) Federal standing requires three elements: (1) an injury in fact; (2) causation; and (3) likelihood that the injury will be redressed by a favorable decision.[28] (*Lujan, supra*, 504 U.S. at pp. 560–561.) However, Proposition 64 expressly incorporates into Business and Professions Code section 17204 only the first element (i.e., an "injury in fact") for federal court standing. The United States Supreme Court has described an "injury in fact" for federal court standing purposes as "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) 'actual or imminent, not "conjectural" or "hypothetical," ' [citations]." (*Lujan*, at p. 560, fn. omitted.) *Lujan* elaborated: "By particularized, we mean that the injury must affect the plaintiff in a personal and individual way." (*Id.* at p. 560, fn. 1.) Alternatively stated, " 'the "injury in fact" test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured.' [Citation.]" (*Id.* at p. 563.) Therefore, for Troyk to have standing to prosecute the UCL claim in this case, he must have personally suffered an invasion or injury to a legally protected interest.

An injury to a tangible property interest, such as money, generally satisfies the "injury in fact" element for standing. In *Danvers Motor Co., Inc. v. Ford Motor Co.* (3d Cir. 2005) 432 F.3d 286 (authored by then Circuit Judge Samuel A. Alito, Jr., currently a Justice of the United States Supreme Court),

---

[28] *Lujan* stated: "[O]ur cases have established that the irreducible [federal] constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, [citations]; and (b) 'actual or imminent, not "conjectural" or "hypothetical," ' [citations]. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.' [Citation.] Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' [Citation.]" (*Lujan, supra*, 504 U.S. at pp. 560–561, fn. omitted.)

the court stated: "A 'legally and judicially cognizable' injury-in-fact must be 'distinct and palpable,' not 'abstract or conjectural or hypothetical.' [Citations.] While it is difficult to reduce injury-in-fact to a simple formula, *economic injury* is one of its paradigmatic forms." (*Danvers Motor Co., Inc., supra*, at p. 291, italics added.) *Danvers* concluded a plaintiff's out-of-pocket expenses or *money spent* was a financial harm that constituted "injury in fact" for federal court standing purposes. (*Id.* at p. 292.) "*Monetary harm* is a classic form of injury-in-fact. [Citation.]" (*Id.* at p. 293, italics added.) Judge Alito noted in conclusion: "Injury-in-fact is not Mount Everest. [Citation.] ('The contours of the injury-in-fact requirement, while not precisely defined, are very generous,' requiring only that claimant 'allege[] some specific, "identifiable trifle" of injury')." (*Id.* at p. 294, quoting *Bowman v. Wilson* (1982) 672 F.2d 1145, 1151.)

Applying that standard for "injury in fact" to the circumstances in this case, we conclude Troyk has alleged an "injury in fact" for purposes of Business and Professions Code section 17204. The complaint alleges he and the other class members paid monthly service charges that were not disclosed as premium in violation of section 381, subdivision (f), and that Farmers wrongfully required them to pay,[29] and that actual payment of money (i.e., monthly service charges) by Troyk, as wrongfully required by Farmers, constituted an "injury in fact" for purposes of Business and Professions Code section 17204. (*Lujan, supra*, 504 U.S. at p. 560; *Danvers Motor Co., Inc. v. Ford Motor Co., supra*, 432 F.3d at pp. 291–293.) Troyk's payment of those service charges was an invasion of a legally protected interest that was concrete, particularized, and actual. (*Lujan, supra*, at p. 560.) This case is not inapposite to *Aron v. U-Haul Co. of California* (2006) 143 Cal.App.4th 796 [49 Cal.Rptr.3d 555], in which the court concluded the plaintiff sufficiently alleged an "injury in fact" under the UCL because he suffered economic loss by being required to purchase excess fuel on return of a rental truck. (*Aron*, at pp. 802–803.) Rather, the cases cited as support by Farmers are factually inapposite to this case. (See, e.g., *Hall v. Time Inc.* (2008) 158 Cal.App.4th 847 [70 Cal.Rptr.3d 466]; *Medina v. Safe-Guard Products, Internat., Inc.* (2008) 164 Cal.App.4th 105 [78 Cal.Rptr.3d 672]; *Peterson v. Cellco Partnership* (2008) 164 Cal.App.4th 1583 [80 Cal.Rptr.3d 316].) None of those cases involved the payment of money in addition to the premium stated

---

[29] On November 1, 2006, S147345, the California Supreme Court granted review in *In re Tobacco II Cases* (Cal.App.) to consider whether each class member must suffer an "injury in fact" or whether only the class representative (e.g., Troyk) must satisfy that requirement for standing to prosecute a UCL cause of action.

in an insurance policy.[30] In moving for summary judgment, Troyk's separate statement of undisputed material facts asserted he was required to pay service charges in addition to the premium stated in his policy. Farmers' opposition did not dispute that asserted fact. Accordingly, we conclude Troyk has sufficiently alleged, and shown for purposes of summary judgment, an "injury in fact" under Business and Professions Code section 17204.

The second element for UCL standing is whether Troyk "lost money or property." (Bus. & Prof. Code, § 17204.) In the circumstances of this case, Troyk's alleged payment of money in addition to the premium stated in his insurance policy sufficiently alleges *lost money*.[31] In this case, Troyk's alleged "injury in fact" and "lost money" are one and the same. In moving for summary judgment, Troyk's separate statement of undisputed material facts asserted he was required to pay service charges in addition to the premium stated in his policy. Farmers' opposition did not dispute that asserted fact. Accordingly, we conclude Troyk has sufficiently alleged, and shown for purposes of summary judgment, "lost money" under Business and Professions Code section 17204.

---

[30] In addition, *Hall* interpreted "injury in fact" under Business and Professions Code section 17204 without reference to its meaning under the United States Constitution, as section 1, subdivision (e), of Proposition 64 requires. (*Hall v. Time Inc., supra,* 158 Cal.App.4th at pp. 853–854.) Accordingly, we decline to follow *Hall*'s reasoning in its interpretation of "injury in fact" under Business and Professions Code section 17204. Nevertheless, *Hall* noted that other courts in post-Proposition 64 cases concluded plaintiffs suffered an "injury in fact" for purposes of UCL standing when they had *expended money* or *lost money* or property. (*Hall, supra,* at p. 854, citing *Aron v. U-Haul Co. of California, supra,* 143 Cal.App.4th at pp. 802–803 and *Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1240 [29 Cal.Rptr.3d 521].) Furthermore, although *Peterson* quoted *Buckland*'s federal standing definition of "injury in fact," it is factually inapposite because it concluded there was no actual economic injury when an insured purchased insurance from an allegedly unlicensed agent. (*Peterson v. Cellco Partnership, supra,* 164 Cal.App.4th at pp. 1590–1591.) Possibly intermingling the element of causation with the element of "injury in fact," *Peterson* stated: "[P]laintiffs here do not allege they paid more for the insurance due to defendant's collecting a commission. They do not allege they could have bought the same insurance for a lower price either directly from the insurer or from a licensed agent. Absent such an allegation, plaintiffs have not shown they suffered actual economic injury. Rather, they received the benefit of their bargain, having obtained the bargained for insurance at the bargained for price. [Citation.]" (*Id.* at p. 1591.) Farmers argue we should apply *Peterson*'s "benefit of a bargain" reasoning to the circumstances in this case and conclude Troyk has not suffered an "injury in fact" for purposes of UCL standing. However, because Troyk alleges he paid more money than set forth as the premium on his insurance policy, we conclude *Peterson* is factually inapposite and decline to adopt its "benefit of a bargain" reasoning in determining whether Troyk suffered an "injury in fact" for purposes of UCL standing.

[31] We note UCL's standing requirements appear to be more stringent than the federal standing requirements. Whereas a federal plaintiff's "injury in fact" may be intangible and need not involve lost money or property, Proposition 64, in effect, added a requirement that a UCL plaintiff's "injury in fact" specifically involve "lost money or property." (Bus. & Prof. Code, § 17204.)

The third element for UCL standing is whether Troyk has alleged, and shown for purposes of summary judgment, that he has lost money "as a result of" Farmers' unfair competition under the UCL. (Bus. & Prof. Code, § 17204.) Because neither Proposition 64 nor Business and Professions Code section 17204 defines the phrase "as a result of," we interpret it according to its common usage. As Farmers argue, the phrase "as a result of" connotes an element of *causation* (i.e., Troyk lost money *because of* Farmers' unfair competition). Therefore, we must determine whether Troyk alleged causation and showed there was no triable issue of fact on the element of causation that would preclude summary judgment in his favor. In a post-Proposition 64 case, one court discussed causation for UCL standing purposes: "[T]here must be a causal connection between the harm suffered and the unlawful business activity. That causal connection is broken when a complaining party would suffer the same harm whether or not a defendant complied with the law." (*Daro v. Superior Court* (2007) 151 Cal.App.4th 1079, 1099 [61 Cal.Rptr.3d 716].)[32] For purposes of this appeal, we need not, and do not, decide exactly what standard of causation (e.g., "a substantial factor" causation standard) applies in determining whether a plaintiff has standing to prosecute a UCL cause of action.[33] Nevertheless, assuming arguendo the "substantial factor" standard for causation applies, Troyk could have adequately alleged causation for UCL standing purposes by alleging in his complaint that he would not have paid, or not have agreed to pay, the monthly service charges even had those charges been properly disclosed as premium in the insurance policy as required by section 381, subdivision (f). However, as noted above, Troyk's operative complaint simply alleges he "suffered an injury in fact and has lost money as a result of" Farmers' alleged

[32] In *Daro*, the court concluded the plaintiffs failed to prove causation at trial, stating: "Here, the lack of causation is illustrated by the fact the [plaintiffs] would suffer the same injury regardless of whether the [defendants] complied with or violated the Subdivided Lands Act." (*Daro v. Superior Court, supra*, 151 Cal.App.4th at p. 1099.)

[33] Because determination of that question is not necessary for our determination of this appeal and the parties have not cited any reported case substantively and persuasively addressing that question, our determination of that question in this appeal is both premature and unnecessary (although we acknowledge such a determination herein could provide guidance to the trial court and parties in further proceedings in this case). Nevertheless, we discern no legislative intent from Proposition 64's language that would require a standard of causation more stringent than the "a substantial factor" standard that applies to negligence actions (and possibly to breach of contract actions) for a plaintiff to have UCL standing. (CACI Nos. 303 [breach of contract], 430 [negligence]; *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572–573 [34 Cal.Rptr.2d 607, 882 P.2d 298] [negligence]; *Haley v. Casa Del Rey Homeowners Assn.* (2007) 153 Cal.App.4th 863, 871 [63 Cal.Rptr.3d 514] [breach of contract].) For purposes of negligence actions, "[a] substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. [¶] [Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct.]" (CACI No. 430.)

unfair competition under the UCL. Because we dispose of this appeal on another ground below, we assume arguendo that Troyk's summary allegation of causation is sufficient for pleading purposes (although a more specific factual allegation regarding causation would have been preferable).

As noted above, in moving for summary judgment, Troyk had the burden to produce evidence showing there are no triable issues of material fact on his causes of action (i.e., his UCL and breach of contract causes of action) and that he is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subds. (c), (p)(1); *Aguilar, supra*, 25 Cal.4th at p. 843.) Code of Civil Procedure section 437c, subdivision (p)(1), states: "A plaintiff or cross-complainant has met his or her burden of showing that there is no defense to a cause of action if that party has proved each element of the cause of action entitling the party to judgment on that cause of action." For purposes of a UCL cause of action, a plaintiff therefore must prove the elements for standing to bring a UCL cause of action, including causation of loss of money or property as a result of unfair competition under the UCL. (Bus. & Prof. Code, § 17204.) "In determining whether the papers show that there is no triable issue as to any material fact the court shall consider all of the evidence set forth in the papers . . . and all inferences reasonably deducible from the evidence, except summary judgment may not be granted by the court based on inferences reasonably deducible from the evidence, if contradicted by other inferences or evidence, which raise a triable issue as to any material fact." (Code Civ. Proc., § 437c, subd. (c).)

Based on our independent review of the parties' summary judgment papers, we conclude Troyk has *not* carried his burden to show there is no triable issue of fact regarding the element of causation for his standing to prosecute his UCL cause of action. Troyk's separate statement of undisputed material facts asserts Farmers required him and the other class members to pay a service charge to obtain a one-month policy. It also asserts he and the other class members paid the premium stated in the declarations page, but the service charge was not specified in any of the policy documents. However, Troyk's separate statement did *not* assert any purported undisputed fact showing the element of *causation*, nor did it refer to any evidence showing causation. His separate statement did *not* contain any asserted fact that he or the other class members would not have paid the monthly service charges had they been disclosed in the policy documents as required by section 381, subdivision (f). Furthermore, his moving papers did not contain or refer to any evidence supporting such an asserted fact. Therefore, Troyk, as the party moving for summary judgment, did not satisfy his initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact regarding his UCL cause of action. (*Aguilar, supra*, 25 Cal.4th at p. 850.) Having failed to satisfy that burden, Troyk was not entitled to summary judgment as a matter of law.

Although Farmers argue in their supplemental brief that the trial court erred by not granting *their* motion for summary judgment because Troyk cannot show their alleged unfair competition under the UCL caused him to lose money (i.e., pay the monthly service charges), Farmers, like Troyk, did not satisfy their burden to show there is no triable issue of fact on the UCL standing element of causation. Farmers' separate statement of undisputed material facts in support of their motion contained only two asserted statements that arguably relate to the causation element. It asserted that Troyk "voluntarily" paid the insurance premiums and service charges and that he never complained to them (or Prematic) about the amount of the service charges. Those asserted facts do not show it was undisputed Troyk would have paid the service charges even had Farmers disclosed them as premium in the policy documents as required by section 381, subdivision (f).[34] Because Farmers' separate statement did not contain any asserted fact showing there is no triable issue of fact regarding the element of causation, the trial court properly denied their motion for summary judgment.

At trial, Troyk will, of course, have the burden to prove by a preponderance of the evidence that he has standing under Business and Professions Code section 17204 to prosecute the UCL cause of action on behalf of the class members in this case. (*Mervyn's, supra*, 39 Cal.4th at pp. 227, 232–233; *Buckland, supra*, 155 Cal.App.4th at pp. 812–813; *Lujan, supra*, 504 U.S. at p. 561.) Therefore, he will, in particular, have the burden to prove the causation element for UCL standing.[35] In the event Troyk successfully proves at trial that he has standing to prosecute the UCL cause of action and proves the other elements of that cause of action, the trial court may award the class

---

[34] In support of those asserted facts, Farmers' separate statement cites certain excerpts from Troyk's deposition. As reflected in those excerpts, Troyk testified he paid the service charges every month and believed the amount was reasonable (i.e., it "didn't bother" him). Therefore, even had Farmers' separate statement asserted there was no causation, their cited evidence would have been insufficient to support that asserted fact and show there is no triable issue whether Troyk lost money because of Farmers' section 381, subdivision (f) violation.

[35] To the extent Troyk personally lacks standing because of the lack of causation in his particular circumstances, he presumably could no longer adequately represent the other class members. In that event, the trial court should consider any motion that may be filed by Troyk or counsel for the class members for leave to amend the complaint to substitute in Troyk's place as the class representative another class member who potentially can prove he or she has the requisite standing to prosecute the UCL cause of action on behalf of the class members. (See, e.g., *Branick v. Downey Savings & Loan Assn.* (2006) 39 Cal.4th 235, 243 [46 Cal.Rptr.3d 66, 138 P.3d 214] ["[C]ourts have permitted plaintiffs who have been determined to lack standing, or who have lost standing after the complaint was filed, to substitute as plaintiffs the true real parties in interest. [Citations.] Amendments for this purpose are liberally allowed. [Citations.]"].) In the event the instant class action complaint is dismissed for lack of a class member who has standing to prosecute the UCL cause of action and serve as the class representative, the California Attorney General or a district attorney may nevertheless prosecute a UCL action against Farmers for violation of section 381, subdivision (f). (Bus. & Prof. Code, § 17204.)

members appropriate restitution and may also order injunctive relief against Farmers. (Bus. & Prof. Code, §§ 17202, 17203.)

V

*Breach of Contract Cause of Action*

Farmers also contend the trial court erred by granting Troyk's motion for summary judgment because there are triable issues of material fact on his cause of action for breach of contract. Because we reverse the summary judgment based on a triable issue of fact regarding Troyk's standing to prosecute his UCL cause of action as discussed above, we need not address Farmers' alternative contention of trial court error in finding no triable issue of fact regarding his breach of contract cause of action. Nevertheless, because *Troyk*'s motion for summary judgment sought, in the alternative, summary adjudication of his breach of contract cause of action, we consider the record on appeal to determine whether he satisfied his burden to show there was no triable issue of material fact regarding that cause of action and he is entitled to summary adjudication on that cause of action.

■■■ As Troyk notes, one court stated (albeit arguably in oversimplified language): "To be entitled to damages for breach of contract, a plaintiff must plead and prove (1) a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff. [Citations.]" (*Walsh v. West Valley Mission Community College Dist.* (1998) 66 Cal.App.4th 1532, 1545 [78 Cal.Rptr.2d 725].) Implicit in the element of damage is that the defendant's breach *caused* the plaintiff's damage. Civil Code section 3300 generally requires proof of causation: "For the breach of an obligation arising from contract, the measure of damages . . . is the amount which will compensate the party aggrieved for all the detriment *proximately caused thereby*, *or* which, in the ordinary course of things, *would be likely to result therefrom*."[36] (Italics added.) "An essential element of a claim for breach of contract are damages resulting from the breach. [Citation.] Causation of damages in contract cases requires that the damages be proximately caused by the defendant's breach. [Citations.]" (*St. Paul Fire & Marine Ins. Co. v. American Dynasty Surplus Lines Ins. Co.* (2002) 101 Cal.App.4th 1038, 1060 [124 Cal.Rptr.2d 818], italics omitted; see also *Vu v.*

[36] In the event a defendant's breach of contract did not cause harm to the plaintiffs, the trier of fact may nevertheless award the plaintiffs nominal damages. (Civ. Code, § 3360 ["When a breach of duty has caused no appreciable detriment to the party affected, he may yet recover nominal damages."]; CACI No. 360 ["If you decide that [*name of defendant*] breached the contract but also that [*name of plaintiff*] was not harmed by the breach, you may still award [*him/her/it*] nominal damages such as one dollar."]; 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 878, pp. 965–966.)

*California Commerce Club, Inc.* (1997) 58 Cal.App.4th 229, 233 [68 Cal.Rptr.2d 31].) Regarding the element of causation, CACI No. 303 requires proof the plaintiff "was harmed by" a defendant's breach of contract. In *Haley v. Casa Del Rey Homeowners Assn., supra,* 153 Cal.App.4th 863, the court upheld as proper the trial court's instruction on the element of causation: " '[T]hat the failure of the defendants was *a substantial factor in causing* damage to the plaintiffs.' " (*Id.* at p. 871, italics added.)

In the circumstances of this case, we conclude Troyk did *not* satisfy his burden to show he was entitled to summary adjudication of his breach of contract cause of action because his motion papers did not show there was no triable issue on the element of *causation* of damages. Regarding Troyk's breach of contract cause of action, his separate statement of undisputed material facts did *not*, as with his UCL cause of action discussed above, assert any fact that Farmers' breach of contract *caused* his (and the class members') damages. Troyk's separate statement asserts that Farmers required him and the other class members to pay a service charge to obtain a one-month policy. It also asserts he and the other class members paid the premium stated in, and complied with all terms of, the insurance policy. However, Troyk's separate statement did *not* assert any purported undisputed fact showing the element of causation, and did not refer to any evidence showing causation. His separate statement did *not* contain any asserted fact that he or the other class members would not have paid the monthly service charges had they been disclosed in the policy documents as required by section 381, subdivision (f). Furthermore, his moving papers did not contain or refer to any evidence supporting that asserted fact. Therefore, Troyk, as the party moving for summary adjudication on his breach of contract cause of action, did not satisfy his initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact. (*Aguilar, supra,* 25 Cal.4th at p. 850.) Having failed to satisfy that burden, Troyk was not entitled to summary adjudication as a matter of law on his breach of contract cause of action.

## VI

### *Constitutional Right to Due Process*

Farmers contend the judgment violates their federal constitutional right to due process of law. However, because we reverse the summary judgment, we do not address, as premature, the question whether any future award of restitution may violate Farmers' federal constitutional right to due process of law.

Nevertheless, we are unpersuaded by Farmers' argument that their right to due process was violated because they did not have "fair notice" of section

381, subdivision (f)'s meaning prior to the judgment and the trial court's new interpretation of that statute could not be retroactively applied. The trial court's (and now our) interpretation of the term "premium," as used in section 381, subdivision (f), is based on the clear and unambiguous meaning of that term. Farmers cannot reasonably argue they could never have predicted the trial court, and now this court, would interpret section 381, subdivision (f), in this manner. Furthermore, because section 381, subdivision (f), was originally enacted in 1935, Farmers cannot reasonably contend that statute is being "retroactively" applied to insurance policies issued and service charges imposed during the class period that began on October 6, 2000.

## VII

### *Summary Judgment and Summary Adjudication*

Because Troyk did not satisfy his burden to show there are no triable issues of material fact and he is entitled to judgment as a matter of law, the trial court erred by granting his motion for summary judgment. (Code Civ. Proc., § 437c, subds. (c), (p)(1); *Aguilar, supra*, 25 Cal.4th at pp. 843, 855.) As discussed above, there exists a triable issue of fact regarding the element of causation on Troyk's standing to prosecute the UCL cause of action (as well as on the breach of contract cause of action). Furthermore, because Farmers did not satisfy their burden to show there are no triable issues of material fact and they are entitled to judgment as a matter of law, the trial court did not err in denying their motion for summary judgment.

In granting Troyk's motion for summary judgment, the trial court implicitly rejected Farmers' affirmative defenses. In effect, the court found there were no triable issues of material fact regarding those defenses. Because Troyk alternatively moved for summary adjudication of Farmers' affirmative defenses, the court implicitly found Troyk was entitled to summary adjudication on those defenses. Farmers have not presented any substantive arguments on appeal that persuade us there are any triable issues of material fact on their affirmative defenses. Accordingly, although we reverse the summary judgment, Troyk is entitled to summary adjudication of Farmers' seven affirmative defenses (i.e., for failure to state a cause of action, rights governed by agreements, acts or omissions of others, laches, waiver and estoppel, adequate remedy at law, and statutes of limitations). (Code Civ. Proc., § 437c, subd. (f).)

VIII

*Prematic's Appeal*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is reversed and the matter is remanded with directions that the trial court (1) vacate its order granting Troyk's motion for summary judgment; and (2) issue a new order denying Troyk's motion for summary judgment, Farmers' motion for summary judgment, and Troyk's motion for summary adjudication of his UCL and breach of contract causes of action, but granting Troyk's motion for summary adjudication of Farmers' affirmative defenses. The parties shall bear their own costs of appeal.

Nares, Acting P. J., and Haller, J, concurred.

The petition of all appellants and respondent for review by the Supreme Court was denied June 10, 2009, S172288. Baxter, J., Chin, J., and Corrigan, J., were of the opinion that the petition should be granted.

---

[*]See footnote, *ante*, page 1305.